TROWBRIDGE *v.* CITY OF LANSING.

NUISANCE—PIGGERY—GARBAGE DISPOSAL—INJUNCTION.
In a suit by property owners to restrain a city from oper-
ating a piggery as a garbage disposal plant, on the ground
that it constituted a public nuisance, evidence *held*, to
justify a decree in favor of plaintiffs, notwithstanding
earnest and sincere efforts on the part of the city officials
to so operate the piggery that it would not be offensive
to plaintiffs.

Appeal from Eaton; McPeek (Russell R.), J. Re-
manded for reference April 29, 1926. (Docket No.
79.) Submitted January 11, 1927. Decided Feb-
ruary 4, 1927.

Bill by A. C. Trowbridge and others against the
city of Lansing and others to abate a nuisance. From
a decree for plaintiffs, defendants appeal. Modified
and affirmed.

*Elmer N. Peters* and *Rosslyn L. Sowers,* for plain-
tiffs.

*D. G. F. Warner* and *Dean W. Kelley,* for defend-
ants.

CLARK, J. To dispose of garbage, the city of
Lansing, in 1921, acquired about 250 acres of land
and established a piggery thereon, in Delta township,
Eaton county, three miles from the city. Suit was
commenced to restrain the establishing of the piggery,
but it was held to have been brought prematurely.
*City of Lansing* v. *Eaton Circuit Judge,* 214 Mich.
117. A large number of hogs has been kept and the
garbage collected in the city has been fed daily.
Garbage is defined by ordinance of the city:

Nuisance, 29 Cyc. pp. 1162, 1174, 1178, 1229.

"Garbage, within the meaning of this ordinance, shall be construed to mean rejected food wastes, and to include every refuse accumulation of animal, fruit, or vegetable matter, used or intended for food, or that attends the preparation, use, cooking, dealing in, or storing, of meat, fish, fowl, fruit, or vegetables."

To show operation, we quote from opinion of the trial judge:

"It appears from the proofs that the garbage is first deposited by the citizens in 11 gallon cans, of which there are about 11,000 in use, and in which it is collected once a week, from residences, and daily from hotels and restaurants.    The cans and their contents are conveyed daily (except Sundays) to the piggery on five motor trucks.    Two trips are usually made daily by each truck, and about 40 tons of garbage are daily carried to the piggery.  ·  At times the liquids in the cans are jolted out upon the trucks, and also upon the roadways.

"Upon arrival at the farm, the trucks are driven into sheds, 100 feet long by 34 feet wide, with two parallel cement feeding platforms running their entire length.    On these platforms the garbage is dumped, three to four loads on a side, and after examination for glass and other undesirable matter, the hogs are let in to feed upon it.    There are three of these feeding pens.

"The average number of hogs in the piggery in 1924 was 1,200, but there are as many as 1,500 at times, and all are fed twice a day.

"After the hogs finish eating from the garbage, lime is scattered over the leavings, which are then gathered on manure spreaders and carried out to the fields to be distributed upon the land.    This process begins in the morning and continues until about 4 o'clock in the afternoon, at which time lime is spread over the day's accretions.    No further disturbance occurs until the land is fitted for a crop.    It may be stated that prior to July, 1924, as the proofs indicate, instead of using the spreader, it was customary to draw out this refuse, or offal, as it has been called, in dump wagons, and throw it upon the fields in small heaps upon which lime was thrown."

Plaintiffs have their homes and live about and in the vicinity of the piggery. Alleging nuisance, they filed bill in 1924 to have it abated and had decree. Defendant city appealed. The record showed beyond question that the material allegations of the bill were true and that plaintiffs were entitled to the relief prayed.

A witness in the case had testified of a plan for eliminating objectionable features. When the appeal came on for hearing in this court, in April, 1926, nuisance was conceded as a fact, and counsel for the city argued for further time in which to attempt correction of methods. The business being lawful, the investment large, the problem difficult, and a new plan being proposed, this court directed the entering of an order permitting operation to continue until September 1, 1926. Such test period expiring, defendant city filed claim that it had met objections of plaintiffs, which plaintiffs denied. On that issue testimony was taken before the trial judge and returned into this court. The matter has been briefed and argued by counsel. There is but one question here, Has the city succeeded in abating the nuisance?

The area affected is, approximately, a circle having a diameter of nearly three miles, the piggery in the center. The testimony taken before decree established that within such area, and according to the direction of wind, plaintiffs suffered, in their homes and about their premises, physical discomfort from the sickening, nauseating, and offensive odors. And they were annoyed by flies in great and unusual numbers. It was shown, too, that because of the nuisance plaintiffs' properties were less desirable. Honorable Alfred H. Doughty, then mayor of Lansing, testified:

"*Q.* Would you want the smell that you, yourself, have smelled out there, to be invading your home—would you want it—the smell of it, in your house?

"*A.* I don't think I would."

In its efforts toward reform, the chief difficulty encountered by the city is the garbage itself, which is a nuisance *per se.* It is malodorous and the quality is persisting. During the test period the city increased its supply of water for cleansing, and, to facilitate that, built concrete floors. It installed a spraying system and it erected sheds in an attempt to confine the odors. But the chief reform is of the method of disposing of waste garbage taken from the feeding pens. Formerly, as above noted, it was spread over the fields or left in piles therein. Now the city has a trenching machine. The waste is taken by truck from the pens, dumped into a shallow trench and covered by earth. While there is much testimony to the contrary, we think the tendency of the new methods is to minify, somewhat, the objectionable features; but the great preponderance of evidence now before us is to the effect that the nuisance still exists. Edward D. Rich, director of the bureau of engineering of the Michigan department of health, William C. Hirn, assistant engineer of the department, Professor George A. Branaman, and Professor W. E. J. Edwards of the Michigan State College aided the city in its efforts toward reform. We mention this to show, and it is the fact, that the city officials have made an earnest and sincere effort to save the piggery. The professors and the engineers testified for defendants. But any sensible person may testify of the presence of offensive odors.

On the issue now here, twelve witnesses were sworn for the city. Running through much of their testimony is an element of confession of the presence of such odors. Forty-four witnesses were sworn for plaintiffs. Their testimony is substantially a repetition of that which was before the trial judge on the original hearing, and is to the effect that the efforts of the city during the test period have resulted in no

considerable abatement of the offensive features. They testified of the prevalence and existence of odors in their homes and about their premises from the garbage and the piggery continuing during the test period, which they characterized as "sickening," "nauseating," "rotten," "awfully offensive," etc. They told again of the flies. They testified, also, as before, of personal and physical discomfort and annoyance, and that their homes had been made and were less desirable.

Equity requires that the decree be sustained but it will not become effectual until May 1st next. So modified, the decree is affirmed, with costs to plaintiffs.

SHARPE, C. J., and BIRD, SNOW, STEERE, FELLOWS, WIEST, and McDONALD, JJ., concurred.