JACKSON COUNTY DRAIN COMMISSIONER
v VILLAGE OF STOCKBRIDGE

Docket No. 258008. Submitted January 10, 2006, at Grand Rapids. Decided January 19, 2006. Approved for publication March 16, 2006, at 9:00 a.m. Leave to appeal sought.

The Jackson County Drain Commissioner and others brought an action in the Jackson Circuit Court against the village of Stockbridge and others, including the Ingham County Drain Commissioner, seeking superintending control, mandamus, and declaratory and injunctive relief concerning the village's discharge of excess wastewater into the Jacobs Lake Drain. The court, James C. Kingsley, J., granted the defendants summary disposition. The plaintiffs appealed.

The Court of Appeals *held*:

1. Contrary to the plaintiffs' argument, MCL 280.433(1), which concerns agreements between the appropriate drain authority and a landowner to provide drainage service to lands, does not apply to this case.

2. MCL 280.423, which concerns the approval necessary to discharge sewage to a drain, does apply to this case. The plaintiffs, however, failed to establish that an issue of material fact existed concerning whether the proposed discharge would result in a detrimental deposit of sediment in the affected drains, which is prohibited under MCL 280.423(1). Even the testimony of the plaintiffs' expert witness did not indicate that the proposed discharge would significantly contribute to the sediment deposited downstream from the discharge.

3. The village was not required to obtain approval for its proposed discharge from the intercounty drainage board pursuant to MCL 280.423(6). Because the plaintiffs failed to produce evidence within their control to support their claim that the Jacobs Lake Drain was part of the intercounty drainage districts involved, an adverse inference may be drawn. The Court of Appeals concluded that the Jacobs Lake Drain is an intracounty drain, and the village was only required to obtain approval for the discharge from the Ingham County Drain Commissioner.

4. Because the plaintiffs failed to meet their burden of proof under the governmental immunity statutes, summary disposition was properly granted. In *Pohutski v City of Allen Park*, 465 Mich 675, 689-690 (2002), the Supreme Court held that MCL 691.1407 does not permit a trespass-nuisance exception to governmental immunity. While the plaintiffs argue that *Pohutski* does not apply to their claims because they were seeking only equitable relief to abate a nuisance, the plain language of MCL 691.1407(1) does not limit the immunity from tort liability to liability for damages. Any exception to immunity thus must be found in the act itself. Under MCL 691.1417(2), the defendants are not immune from liability for overflows or backups of the drains at issue to the extent that they are "appropriate governmental agencies" as defined in MCL 691.1416(b). The village and the intercounty drainage district are not appropriate governmental agencies under the statute, however, and there was insufficient evidence that the requirements of MCL 691.1417(3) and (4) were satisfied in this case to allow the plaintiffs to proceed against the Ingham County Drain Commissioner and the drain district, even though those defendants arguably qualify as appropriate governmental agencies.

Affirmed.

GOVERNMENTAL IMMUNITY — EXCEPTIONS — DRAINS — NUISANCE — TRESPASS.

The governmental immunity act does not limit the immunity from tort liability to liability for damages, and a trespass-nuisance action against a governmental agency that merely seeks abatement of the nuisance is barred by governmental immunity unless an exception to governmental immunity is found in the act itself; an exception to governmental immunity exists for the overflow or backup of a "sewage disposal system" to the extent that the overflow or backup is a "sewage disposal system event" and the governmental agency is an "appropriate governmental agency" as those terms are defined in the act (MCL 691.1407[1], 691.1416, 691.1417[2]).

*Mika Meyers Beckett & Jones PLC* (by *Douglas A. Donnell* and *Ronald M. Redick*) for the Jackson County Drain Commissioner and others.

*Foster, Swift, Collins & Smith, P.C.* (by *Stephen O. Schultz* and *Kirsten M. McNelly*), for the village of Stockbridge.

*Hubbard, Fox, Thomas, White & Bengston, P.C.* (by *Geoffrey H. Seidlein* and *Stacy L. Hissong*), for the Grand River Intercounty Drainage Board, the Ingham County Drain Commissioner, and the Jacobs Lake Drain District.

Before: OWENS, P.J., and SAAD and FORT HOOD, JJ.

PER CURIAM. Plaintiffs appeal as of right an order granting summary disposition pursuant to MCR 2.116(C)(8) to defendants. This case arose when the village of Stockbridge contracted with the Ingham County Drain Commissioner to discharge its excess wastewater into the Jacobs Lake Drain, which flows through the Wild River and Portage River drains and ultimately the Grand River Drain. We affirm.

The Wild River, the Portage River, and the Grand River intercounty drains all flow through Jackson County. The Jacobs Lake Drain is located entirely in Ingham County. The village, which is also located in Ingham County, is outside any of the previously mentioned intercounty drainage districts. Plaintiff Geoffrey Snyder, the Jackson County Drain Commissioner, testified that flooding had historically occurred along all three drains before he was first elected in 1976, and that the flooding had worsened every year since. He admitted that no assessments had been levied since 1918, and that maintenance had not been performed on the drains during the time he had been in office. One of the landowners along the drain testified that one of his parcels flooded seven out of ten springs. He stated that he used to farm other properties along the drain, but abandoned them when he could not harvest a crop as a result of the flooding. He also said he had observed frequent flooding on others' properties. Another landowner along the drain testified that a couple of times a

year—usually after a heavy rain—the Wild River Drain would back up, and the tributaries would overflow their banks.

According to Richard Grant, Jr., a professional engineer hired by the village, the village had historically disposed of its treated effluent by spraying it over crop fields. When the village began having trouble with its existing system's ability to accept new flow, it hired Grant's firm to explore other discharge alternatives. The firm investigated several alternatives, including discharge into the Huron Lake Drain and Snyder's proposal. The firm recommended continuing to dispose of the wastewater by spray irrigation during the warm months and discharge into the Jacobs Lake Drain during cold weather. After five public meetings and hearings before the Department of Environmental Quality (DEQ), with Snyder participating in at least one of the five, the DEQ issued a finding of no significant impact, the project plan was approved, and funding was received. Although Snyder claimed he objected to the proposed plan, he acknowledged that he did not formally appeal the DEQ's finding of no significant impact. He wrote the village a letter on October 6, 2002, advising the village that it needed to add its lands to the intercounty drainage district pursuant to MCL 280.433. The DEQ issued the village a discharge permit on June 17, 2003.

On September 3, 2003, the village and the Ingham County Drain Commissioner entered into an agreement that allowed the village to discharge into the Jacobs Lake Drain. The village agreed to pay the Jacobs Lake Drain a one-time tie-in fee of $30,000 and annual maintenance fees of $1,500. It further agreed it would not discharge at a rate of more than three cubic feet a second and would not discharge when the Jacobs Lake

Drain was at 90 percent capacity. The commissioner reserved the right to temporarily suspend the village's discharge when, in his discretion, he determined that an emergency situation existed. The agreement contained no specific provisions for downstream flooding or payments to the various intercounty drains.

On October 16, 2003, the Grand River Intercounty Drainage Board voted two to one that a permit pursuant to MCL 280.433 was not required, and voted two to one to not require any other type of permit from the village. On October 24, 2003, plaintiffs filed a complaint seeking superintending control, mandamus, and declaratory and injunctive relief. The village and the drain defendants filed respective motions for summary disposition pursuant to MCR 2.116(C)(8) and (10). Plaintiffs moved for summary disposition pursuant to MCR 2.116(C)(10) on counts I, IV, and VI of their amended complaint. The trial court granted defendants summary disposition pursuant to MCR 2.116(C)(8).

Plaintiffs essentially argue that the Jacobs Lake Drain, the Wild River Drain, the Portage River Drain, and the Grand River Drain all comprise a single intercounty drain, and that defendants were required to extend the intercounty drain pursuant to either MCL 280.511 *et seq.* or MCL 280.433 before the village could discharge into the Jacobs Lake Drain.[1] We disagree.

---

[1] "Drain" is defined by MCL 280.3 as follows:

The word "drain", whenever used in this act, shall include the main stream or trunk and all tributaries or branches of any creek or river, any watercourse or ditch, either open or closed, any covered drain, any sanitary or any combined sanitary and storm sewer or storm sewer or conduit composed of tile, brick, concrete, or other material, any structures or mechanical devices, that will properly purify the flow of such drains, any pumping equipment necessary to assist or relieve the flow of such drains and any levee, dike, barrier, or a combination of any or all of same constructed, or

This Court reviews a trial court's grant of summary disposition pursuant to MCR 2.116(C)(10) de novo, *Dressel v Ameribank*, 468 Mich 557, 561; 664 NW2d 151 (2003), to determine whether a genuine issue of material fact exists or whether one of the parties is entitled to judgment as a matter of law, *Scalise v Boy Scouts of America*, 265 Mich App 1, 10; 692 NW2d 858 (2005). Summary disposition granted pursuant to MCR 2.116(C)(8) is also subject to review de novo to determine whether a claim is so clearly unenforceable as a matter of law that no factual development could justify recovery. *Adair v Michigan*, 470 Mich 105, 119; 680 NW2d 386 (2004), quoting *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999).

The specific language of MCL 280.433(1) refers to an agreement between the appropriate drain authority and a landowner. No mention is made of a municipality. Had the Legislature intended to include municipalities in this provision, it could easily have done so in a manner similar to MCL 280.71, which provides the procedure for freeholders to petition for a county drain, then provides a separate procedure for a municipality to petition for a drain. Moreover, the agreement referred to in MCL 280.433 is for the purpose of providing drainage service to lands. There is no indication in the instant case that the village intended to drain any lands. Therefore, MCL 280.433 is not applicable.

Instead, MCL 280.423 is the more applicable authority. MCL 280.423(6) requires a person to apply for and receive written approval and pay a fee before being allowed to connect sewage to a county or intercounty

proposed to be constructed, for the purpose of drainage or for the purification of the flow of such drains, but shall not include any dam and flowage rights used in connection therewith which is used for the generation of power by a public utility subject to regulation by the public service commission.

drain. MCL 280.423(1) provides certain standards the person must meet before discharging sewage and waste matter into the county or intercounty drain. One of these requirements is to obtain a discharge permit from the DEQ pursuant to MCL 324.3112, which the village did. Moreover, unlike MCL 280.433, MCL 280.423(11) specifically provides that a "person" includes a governmental entity.

Because plaintiffs were not challenging the DEQ discharge permit, to withstand summary disposition, they had to present sufficient evidence to raise a genuine issue of material fact concerning whether the proposed discharge was "capable of producing in the drain detrimental deposits, objectionable odor nuisance, injury to drainage conduits or structures, or capable of producing such pollution of the waters of the state receiving the flow from the drains as to injure livestock, destroy fish life, or be injurious to public health." MCL 280.423(1). "Detrimental" is defined as damaging or harmful. *Random House Webster's College Dictionary* (2001).

The discharge permit issued by the DEQ provided that "[t]he receiving water shall contain no unnatural turbidity, color, oil films, floating solids, foams, settleable solids, or deposits as a result of this discharge." It also proscribed the discharge of "solid or viscous pollutants in amounts which will cause obstruction to the flow in the sewerage system resulting in interference . . . ." It allowed a discharge of suspended solids from March 1 to April 30 of up to 100 milligrams a liter a day, not to exceed an average of 70 milligrams a liter a day, and a discharge of suspended solids from November 1 to December 31 and in February of up to 45 milligrams a liter a day, not to exceed an average of 40 milligrams a liter a day. A milligram equals 0.001

grams, there are 1,000 grams in a kilogram, and one kilogram is about the mass of one liter of water. Therefore, at the highest rate, the permitted discharge of total suspended solids was 0.01 percent of the total discharge.

Snyder testified that the village was authorized to discharge effluent at an average rate of 2.7 cubic feet a second. The design capacity for the Jacobs Lake Drain was 650 cubic feet a second. And the Jacobs Lake Drain contributed merely one to five percent of the total flow of the Grand River Drain. Therefore, the total flow of the Grand River Drain was between 13,000 and 65,000 cubic feet a second. The proposed discharge from the village would comprise between 0.0004 and 0.002 percent of this total flow. Of this percentage of the total flow, not more than 0.01 percent would involve suspended solids.

Ann Heyt, a professional engineer who testified for plaintiffs, estimated that the proposed discharge would contribute between 21,000 and 27,000 pounds of sediment a year to the 7 million pounds a year already being deposited in the Portage River. Thus, plaintiffs' expert estimated that the discharge would contribute 0.3 to 0.39 percent of the total sediment a year. She acknowledged that the amount contributed was a very small fraction of the total, but could not estimate whether the addition of the sediments would make the situation worse because the amount of sediment deposited in a particular area depended on many factors, such as the different flow rates, velocity, elevation, and hydraulics of the stream. Given that even testimony introduced by plaintiffs did not indicate a significant contribution, we conclude that plaintiffs failed to establish that an issue of material fact existed concerning whether the proposed discharge would result in a detrimental deposit.

The next question is whether the village was required to obtain written approval from only the Ingham County Drain Commissioner or was required to obtain written approval from the intercounty drainage board pursuant to MCL 280.423(6). This requires a determination whether the proposed discharge to the Jacobs Lake Drain would constitute a discharge into an intracounty drain or an intercounty drain. MCL 280.511(e) defines an "intercounty drain" as "any drain, irrespective of size, carrying drainage water or sewage originating in more than one county, and includes drains located, established and constructed by a county drain commissioner or drainage board, by a city, village or township." "Originate" is defined in relevant part as "to give origin or rise to[.]" *Random House Webster's College Dictionary* (2001). The relevant definition of "origin" is "the first stage of existence; beginning." *Id.* MCL 280.23 provides:

> The commissioner shall have jurisdiction over all drains within his county, including those heretofore established and now in process of construction. Drains extending into more than 1 county or affecting lands in more than 1 county, shall be established and constructed in accordance with the provisions of this act regulating the establishment and construction of drains traversing more than 1 county or affecting lands in more than 1 county. Nothing in this act shall be construed as depriving a drain commissioner of jurisdiction or as making any drain an intercounty drain, merely because a drain extends into another county for the purpose of securing a proper outlet and not for the purpose of draining any lands in the other county: Provided, such extension is approved by the drain commissioners and the board of supervisors of each affected county. The portion of any such drain extending into another county shall not be considered in determining the number of signers required to a petition to locate, establish and construct.

Here, although the Jacobs Lake Drain empties into the Wild River Drain, which empties into the Portage River

Drain, which empties into the Grand River Drain, the Jacobs Lake Drain and the Jacobs Lake Drain District are located entirely within Ingham County. The Jacobs Lake Drain does not extend into Jackson County to empty into the Wild River Drain. Instead, the Wild River Drain originates in Ingham County. Moreover, there is no indication from the maps provided to the trial court that water or sewage originating in another county empties into the Jacobs Lake Drain.

In any event, whether the Jacobs Lake Drain was considered part of the respective intercounty drains should have been indicated in the order establishing the intercounty drainage districts pursuant to MCL 280.105. Plaintiffs could easily have provided this order to establish their claim that the Jacobs Lake Drain was part of the intercounty drainage districts. They did not. When a party fails to produce evidence within its control, an adverse inference may be drawn. *Grossheim v Associated Truck Lines, Inc*, 181 Mich App 712, 715; 450 NW2d 40 (1989). Therefore, we conclude that the Jacobs Lake Drain is an intracounty drain, and the village was only required to obtain written approval from the Ingham County Drain Commissioner. MCL 280.23; MCL 280.423(6); MCL 280.511(e). Our decision on this issue renders moot all of plaintiffs' remaining issues other than the governmental immunity issue.

The trial court granted defendants summary disposition on plaintiffs' trespass-nuisance count on the grounds that defendants were immune. This Court reviews questions of governmental immunity de novo. *Pierce v City of Lansing,* 265 Mich App 174, 176; 694 NW2d 65 (2005). Unless a statutory exception applies, a governmental agency is immune from tort liability when performing a governmental function. *Johnson-McIntosh v Detroit,* 266 Mich App 318, 322; 701 NW2d

179 (2005). In *Pohutski v City of Allen Park,* 465 Mich 675, 689-690; 641 NW2d 219 (2002), our Supreme Court concluded that the governmental immunity statute did not contain a trespass-nuisance exception to governmental immunity.

Nevertheless, plaintiffs argue that because they were only seeking equitable relief, *Pohutski* did not apply. To support their position, plaintiffs rely on *Hadfield v Oakland Co Drain Comm'r,* 430 Mich 139, 152 n 5; 422 NW2d 205 (1988), overruled by *Pohutski, supra* at 679; *Li v Feldt (After Second Remand),* 439 Mich 457, 468-470; 487 NW2d 127 (1992) (*Li II*); and *House Speaker v Governor,* 195 Mich App 376, 385; 491 NW2d 832 (1992), rev'd 443 Mich 560 (1993).[2] In the lead opinion's discussion of public nuisance in *Hadfield, supra* at 152 n 5, Justice BRICKLEY mentioned, "Generally, we do not view actions seeking only equitable relief, such as abatement or injunction, as falling within the purview of governmental immunity." Interpreting Justice BRICKLEY's opinion in *Hadfield,* Chief Justice CAVANAGH stated in *Li II*:

> [*Attorney General ex rel*] *Wyoming Twp* [*v Grand Rapids,* 175 Mich 503; 141 NW 890 (1913)] and *Trowbridge* [*v City of Lansing,* 237 Mich 402; 212 NW 73 (1927)] do not support the existence of a public nuisance exception. In the first place, both cases involved plaintiffs seeking only prospective equitable relief in the form of abatement, to which this Court, in both cases, found they were entitled. As Justice BRICKLEY correctly noted in *Hadfield,* such cases do not even fall within the purview of governmental immunity and cannot properly be cited in that context. . . . The distinction between the government's liability for prospective equitable relief and its liability for retrospective damages or compensation, and the principle that the

---

[2] Both *Hadfield* and *Li II* involved actions for damages rather than actions solely seeking equitable relief.

former kind of liability is generally not barred by sovereign immunity, are fundamental to sovereign immunity law. [*Li II, supra* at 468-469.][3]

*Pohutski* did not specifically address whether a trespass-nuisance action that merely seeks abatement of the nuisance is barred by governmental immunity. Instead, the Court clearly stated that MCL 691.1407 did not permit a trespass-nuisance exception to governmental immunity. *Pohutski, supra* at 678-679. In doing so, the Court relied on the plain meaning of the statute. *Id.* at 683-685. MCL 691.1407(1) provides:

> Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided in this act, this act does not modify or restrict the immunity of the state from tort liability as it existed before July 1, 1965, which immunity is affirmed.

The plain language of the statute does not limit the immunity from tort liability to liability for damages. As noted in *Pohutski, supra* at 689, governmental immunity is to be broadly construed, while exceptions to immunity are to be narrowly construed. To construe the statute as plaintiffs urge in the instant case would be to construe governmental immunity narrowly. Moreover, such a construction would judicially impose a term into the statute that the Legislature did not provide, which is not permitted. *Polkton Charter Twp v Pellegrom,* 265 Mich App 88, 103; 693 NW2d 170 (2005).

---

[3] *Li II* involved a suit against the city of Ann Arbor and a suit against the city of Jackson. In *Pohutski, supra* at 682-684, the Supreme Court distinguished between sovereign immunity and governmental immunity, indicating that sovereign immunity applied only to the state, not to lesser forms of government. Thus, it is questionable whether the reasoning in *Li II* may be applied to lesser forms of government.

In addition, the decisions in both *Hadfield* and *Li II*—with respect to whether a trespass-nuisance action that merely seeks abatement of the nuisance is barred by governmental immunity—were plurality opinions. A plurality opinion of the Supreme Court, in which the reasoning is not supported by a majority of the justices, is not binding on this Court. *Burns v Olde Discount Corp,* 212 Mich App 576, 582; 538 NW2d 686 (1995). Moreover, Justice GRIFFIN, in rejecting the reasoning of the lead opinion in *Li II, supra* at 484, adhered to his previous position in *Li v Feldt (After Remand),* 434 Mich 584, 596; 456 NW2d 55 (1990) (*Li I*). The Court in *Pohutski, supra* at 688, adopted Justice GRIFFIN's opinion in *Li I*. Hence, the Supreme Court impliedly rejected the reasoning of the lead opinion in *Li II.* Therefore, unless an exception to immunity is found in the act itself, plaintiffs' nuisance claim must fail. MCL 691.1417(2) provides:

> A governmental agency is immune from tort liability for the overflow or backup of a sewage disposal system[4] unless the overflow or backup is a sewage disposal system event[5] and the governmental agency is an appropriate

---

[4] "Sewage disposal system" is defined as

> all interceptor sewers, storm sewers, sanitary sewers, combined sanitary and storm sewers, sewage treatment plants, and all other plants, works, instrumentalities, and properties used or useful in connection with the collection, treatment, and disposal of sewage and industrial wastes, and includes a storm water drain system under the jurisdiction and control of a governmental agency. [MCL 691.1416(j).]

[5] A "sewage disposal system event" is defined by MCL 691.1416(k) as

> the overflow or backup of a sewage disposal system onto real property. An overflow or backup is not a sewage disposal system event if any of the following was a substantial proximate cause of the overflow or backup:

governmental agency.[6] Sections 16 to 19 abrogate common law exceptions, if any, to immunity for the overflow or backup of a sewage disposal system and provide the sole remedy for obtaining any form of relief for damages or physical injuries caused by a sewage disposal system event regardless of the legal theory.[7]

The plain language of the statute includes the drains at issue here in the definition of "sewage disposal system." MCL 691.1416(j). Therefore, the statute is applicable to the instant case, and defendants are immune unless the backup would be considered a sewage disposal system event (event). An event is the backup of a sewage disposal system onto real property, MCL 691.1416(k), which is precisely what plaintiffs in the instant case were complaining of. Although MCL 691.1416(k) contains several exceptions to the definition of an event, none of these exceptions applies. Hence, because the

---

(*i*) An obstruction in a service lead that was not caused by a governmental agency.

(*ii*) A connection to the sewage disposal system on the affected property . . . .

(*iii*) An act of war . . . or an act of terrorism.

MCL 691.1416(i) defines "service lead" as "an instrumentality that connects an affected property, including a structure, fixture, or improvement on the property, to the sewage disposal system and that is neither owned nor maintained by a governmental agency."

MCL 691.1416(*l*) defines "substantial proximate cause" as "a proximate cause that was 50% or more of the cause of the event and the property damage or physical injury."

[6] "Appropriate governmental agency" is defined as "a governmental agency that, at the time of a sewage disposal system event, owned or operated, or directly or indirectly discharged into, the portion of the sewage disposal system that allegedly caused damage or physical injury." MCL 691.1416(b).

[7] The last part of MCL 691.1417(2) dispels any nuisance claim for damages, but does not address claims for injunctive relief.

backup was considered an event, defendants were not immune if they were appropriate governmental agencies.

Because the village was not discharging into the Jacobs Lake Drain at the time of the instant suit, the village did not qualify as an appropriate governmental agency. MCL 691.1416(b). The property owners testified about damage to property that occurred upstream of the Grand River Intercounty Drainage District. Therefore, the Grand River Intercounty Drainage Board did not qualify as an appropriate governmental agency because it did not own, operate, or discharge into the portion of the sewage disposal system that purportedly caused the damage. MCL 691.1416(b). Although the Ingham County Drain Commissioner and the Jacobs Lake Drain District arguably qualified as appropriate governmental agencies, plaintiffs' suit could not survive summary disposition under MCL 691.1417(3) and (4) on the basis of the submitted proofs. MCL 691.1417(3) and (4) provide in relevant part:

> (3) If a claimant, including a claimant seeking noneconomic damages, believes that an event caused property damage or physical injury, the claimant may seek compensation for the property damage or physical injury from a governmental agency if the claimant shows that all of the following existed at the time of the event:

> *  *  *

> (d) The governmental agency, having the legal authority to do so, failed to take reasonable steps in a reasonable amount of time to repair, correct, or remedy the defect.

> *  *  *

> (4) In addition to the requirements of subsection (3), to obtain compensation for property damage or physical injury from a governmental agency, a claimant must show both of the following:

* * *

(b) The claimant complied with section 19.

There was no evidence that the Ingham County Drain Commissioner or the Jacobs Lake Drain District had the legal authority to repair a defect to a drain that was located in Jackson County. Moreover, there was no indication that plaintiffs complied with MCL 691.1419, which required plaintiffs to notify defendants of the damage in writing within 45 days after the damage occurred or should have been discovered. Because plaintiffs were unable to meet their burden of proof, summary disposition was properly granted, albeit on different grounds. *Hess v Cannon Twp*, 265 Mich App 582, 596; 696 NW2d 742 (2005).

Affirmed.