MARILYN FROLING REVOCABLE LIVING TRUST v
BLOOMFIELD HILLS COUNTRY CLUB

Docket Nos. 275580, 277438, and 278383. Submitted December 9, 2008,
at Detroit. Decided April 9, 2009, at 9:10 a.m.

The Marilyn Froling Revocable Living Trust brought an action in the
Oakland Circuit Court against the Bloomfield Hills Country Club,
Alan and Marilynne Kiriluk, Roger B. and Barbara Smith, Gregg and
Cindi Williams, the city of Bloomfield Hills, and others, seeking
damages arising out of the flooding of the plaintiff's residential
property in Bloomfield Hills. The Kiriluks, Smiths, and Williamses
made an offer to stipulate the entry of a judgment, to which the
plaintiff did not respond. The court, Fred M. Mester, J., granted
summary disposition in favor of the city, ruling that the doctrine of
governmental immunity barred the claim against the city and that
the plaintiff had failed to properly allege its inverse condemnation
claim against the city. The court also granted summary disposition in
favor of the Kiriluks, Smiths, and Williamses after determining that
the three-year period of limitations had expired before the plaintiff
brought its action. The court awarded attorney fees and costs to the
Kiriluks, Williamses, and Smiths under the offer of judgment court
rule, MCR 2.405. The plaintiff appealed the orders granting summary
disposition to the city and the Kiriluks, Williamses, and Smiths and
awarding the Kiriluks, Williamses, and Smiths attorney fees and
costs under MCR 2.405. The plaintiff also appealed separately the
parts of the order awarding the Kiriluks attorney fees and costs
related to the second of two law firms that represented the Kiriluks
(Potter, DeAgostino, Campbell & O'Dea) and awarding the Kiriluks,
Williamses, and Smiths attorney fees and costs related to represen-
tation provided to them by Honigman Miller Schwartz and Cohn LLP.
The Kiriluks, Williamses, and Smiths cross-appealed with regard to
the attorney fees and costs awards. The appeals were consolidated.

The Court of Appeals *held*:

1. The Michigan Supreme Court has completely and retroac-
tively abrogated the common-law "continuing wrongs" doctrine in
Michigan, including in nuisance and trespass cases. Therefore, the
plaintiff cannot rely on the doctrine to save its claims.

2. The facts show that the plaintiff's last claim first accrued in June 2001. The plaintiff's claims were time-barred because they were not filed by June 2004. The trial court properly granted summary disposition in favor of the Kiriluks, Williamses, and Smiths on the ground that the claim was not filed within the three-year period of limitation provided in MCL 600.5805(10).

3. The trial court did not err by granting the Williamses and the Smiths summary disposition. The plaintiff failed to support its claim that summary disposition was premature by identifying a disputed issue, supporting that issue with independent evidence, and offering an affidavit under MCR 2.116(H) to support its contention.

4. The trial court did not err by granting summary disposition in favor of the city on the ground of governmental immunity. The plaintiff waived any argument that a sewage disposal system event exception to governmental immunity applied in this case.

5. The plaintiff failed to allege any affirmative action by the city directed at the plaintiff's property. The trial court did not err by dismissing the inverse condemnation claim against the city.

6. The offer of judgment made by the Kiriluks, Williamses, and Smiths was actually an attempt to enter a stipulated order of dismissal. The offer failed to meet the requirements for an offer of judgment under MCL 2.405(A)(1). The trial court erred by concluding that the Kiriluks, Williamses, and Smiths were entitled to an award of attorney fees and costs under MCL 2.405. The parts of the trial court's orders awarding such costs and attorney fees must be reversed.

Affirmed in part and reversed in part.

MURPHY, P.J., concurring, wrote separately to state that there is no point in citing unpublished opinions in the majority's opinion when published opinions with precedential value exist.

1. NEGLIGENCE — LIMITATION OF ACTIONS — CONTINUING-WRONGS DOCTRINE.

The Supreme Court, in *Garg v Macomb Co Community Mental Health Services*, 472 Mich 263 (2005), and its progeny completely and retroactively abrogated the common-law "continuing wrongs" doctrine in Michigan jurisprudence, including in nuisance and trespass cases.

2. LIMITATION OF ACTIONS — ACCRUAL OF ACTIONS — NEGLIGENCE.

A plaintiff may not bring an action to recover damages for injury to property unless, after the claim first accrued, the action is commenced within three years after the time of the injury; a claim

accrues at the time the "wrong" upon which the claim is based was done regardless of the time when damage results; the "wrong" is done when the plaintiff is harmed by the negligent act rather than when the defendant acted negligently (MCL 600.5805[1], [10]; 600.5827).

3. MOTIONS AND ORDERS — SUMMARY DISPOSITION — DISCOVERY COMPLETION BEFORE SUMMARY DISPOSITION.

Summary disposition under MCR 2.116(C)(10) is premature if it is granted before discovery on a disputed issue is complete; the question is whether further discovery stands a fair chance of uncovering factual support for the opposing party's position; the party claiming that summary disposition is premature must identify a disputed issue and support that issue with independent evidence by offering the affidavit required by MCR 2.116(H) and probable testimony to support its contentions.

4. JUDGMENTS — OFFERS OF JUDGMENT — SETTLEMENT OFFERS — FINAL ADJUDICATION ON THE MERITS — RES JUDICATA.

A "judgment," as contemplated by the court rule regarding offers to stipulate entry of a judgment, is one that has all the attributes of a judgment after full litigation, is considered a final adjudication on the merits, and implicates the doctrine of res judicata; an offer of settlement is not the same as an offer of judgment (MCR 2.405).

*Mark Granzotto, P.C.* (by *Mark Granzotto*), for the Marilyn Froling Revocable Living Trust.

*Secrest Wardle* (by *William P. Hampton* and *Shannon K. Ozga*) and *Marcelyn Stepanski* for the city of Bloomfield Hills.

*Potter, DeAgostino, O'Dea & Patterson* (by *Steven M. Potter* and *Rick J. Patterson*) for Alan and Marilynne Kiriluk.

*Honigman Miller Schwartz and Cohn LLP* (by *Peter M. Alter* and *Michael P. Hindelang*) for Roger B. and Barbara Smith and Gregg and Cindi Williams.

Before: MURPHY, P.J., and SAWYER and WHITBECK, JJ.

PER CURIAM. These consolidated appeals arise out of flooding on residential property located on Rathmor Road in the city of Bloomfield Hills. In Docket No. 275580, plaintiff Marilyn Froling Revocable Living Trust (the Froling Trust) appeals as of right the trial court's December 21, 2006, order granting the city of Bloomfield Hills (the city) and Alan and Marilynne Kiriluk, Roger and Barbara Smith, and Gregg and Cindi Williams (collectively, the neighbors) summary disposition and the trial court's ruling that the neighbors were entitled to attorney fees and costs under MCR 2.405. In Docket No. 277438, the Froling Trust appeals as of right the trial court's March 23, 2007, order awarding the Kiriluks attorney fees and costs. In Docket No. 278383, the Froling Trust appeals as of right the trial court's May 9, 2007, order awarding the neighbors attorney fees and costs, and the neighbors cross-appeal that order. We affirm in part and reverse in part.

## I. BASIC FACTS AND PROCEDURAL HISTORY

### A. THE FLOODING OF THE FROLINGS' PROPERTY

In 1987, Harold Warner owned two adjacent lots on Rathmor Road in Bloomfield Hills, Michigan. Warner lived in a house on one of the lots, lot 6. The other lot, directly to the east, lot 5, was undeveloped. The Kiriluks purchased lot 5 in January 1987. And in June 1987, William and Marilyn Froling purchased lot 6. William Froling, an experienced real estate developer, met with Warner, walked around the property, and inspected the catch basins and water drainage system. The Frolings purchased the property "as is."

In 1989, the Kiriluks began plans to build a house on their property. Before construction of the Kiriluks' house, there had been a natural swale on the southwest

corner of the Kiriluks' lot. The swale served to move water away from the Frolings' property. Engineers hired by the Kiriluks proposed a site plan that took into account the existing natural drainage system, and the city approved the plan. However, during construction, the Kiriluks brought in dirt to raise the height of their property, and during the re-grading of the lot, the Kiriluks filled in the swale, preventing the natural runoff of water from the southeast corner of the Frolings' property. Despite this alleged deviation from the approved plan, the city issued an occupancy permit for the Kiriluks' home.

In April 1989, the Frolings began experiencing significant flooding on their property. William Froling testified that during heavy rain that month he witnessed water surging through a culvert constructed under Rathmor Road and flowing onto the south side of the road. The flooding was so severe that the water levels reached the steps of the front and back porches of the Frolings' home.

From then on, on numerous occasions following periods of heavy rain or spring thaw, substantial amounts of water would pool on the Frolings' property, particularly on the west and south sides of their home. According to William Froling, the most significant periods of flooding occurred in June 1996, June 1997, June 2001, April and May 2004, and January 2005. During the June 1997 incident, the Frolings' basement was completely flooded, causing over $20,000 in property damage. According to the Frolings, in addition to the Kiriluks' construction, re-grading, construction, and re-direction of water flow on other neighboring properties, including those owned by the Williamses and the Smiths, also contributed to the flooding on their property.

In September 1989, William Froling wrote to the city, requesting that it take steps to alleviate any further flooding problems on his property, asserting that the city should have taken proper precautions when it approved the subdivision plan. Notably, despite claiming that Warner "said he never had any serious water problems while he lived there," Froling indicated that he was put on notice of potential flooding problems at the time he bought the property:

> When I bought the house from Mr. Harold Warner, I asked him why he didn't install lawn sprinklers—and his remark was "Well, live there a year first and I think you will find out you won't need sprinklers!" Of course, I did not know what he meant.

The city hired an engineering firm to investigate the Frolings' flooding complaints, and the investigation revealed that 29 acres of the surrounding property drained into the Frolings' property. (The Frolings also later hired engineers, who determined that 55 acres of the surrounding property drained into their land.) However, the engineers discovered a private drainage system that they thought was probably constructed by the original property owners and was likely the responsibility of the owners of the system.

In November 1989, the city wrote a letter to William Froling, stating that the city's policy was to not involve itself in storm water damage in existing subdivisions and that it was the various property owners' responsibility to resolve any storm water drainage problems affecting their property. More specifically, the city explained as follows:

> In 1923, when the Donnelly Farms Subdivision Plat was approved, drainage easements or other utility easements were not required by Bloomfield Township, which granted the plat approval. By today's standards, a retention basin

with adequate holding capacity and regulated release of storm water would be required. The City of Bloomfield Hills does not involve itself in storm water drainage concerns, except where new subdivisions are being considered or the property being developed is in a floodplain . . . .

Historically, as property developed, each developer was responsible for their storm water runoff. In the 1960's, the City's concern was to prevent any storm water from entering the sanitary sewer system and this is a continuing concern to the City of Bloomfield Hills and other governmental agencies today.

In addressing stormwater [sic] drainage, each property owner is responsible for their own specific problems—some involve trenching or berming, others with their own storm sewer and culverts, and some have installed retention ponds on their property. Any of these methods implemented, have been at the affected property owner's expense. In some instances, where the drainage solution of one property owner detrimentally affects another, civil action in court results in a workable solution.

In your subdivision, . . . your property is on the lowest elevation. My predecessor, who served the City of Bloomfield Hills for the past forty years, told me he had suggested to the Homeowners Association at one time, that they acquire the vacant lot as a retention pond for stormwater [sic] runoff. However, there was no interest in that proposal, as no one was having drainage problems and the value and location of the property warranted development.

I am not aware of any other stormwater [sic] runoff problems in your subdivision and the solution to your specific problem would appear to be best resolved by accommodating the existing flows of water around your property so as not to affect your home. You can accomplish this by one of the above mentioned methods without involving your neighbor's property; although, you could take this before your Homeowner Association to determine if sufficient interest exists to explore other engineering solutions.

In October 1990, the city wrote to the Frolings again, stating that the cost of installation of any storm drain system to alleviate storm water runoff on private land would be the property owners' responsibility.

In 1995, the Smiths' basement flooded with water. The Smiths blamed the flooding on water coming from the Bloomfield Hills Country Club (the Country Club) and complained to the Country Club's management. The Smiths and the Country Club ultimately agreed on a solution: installation of an underground pipe extending from the golf course directly into a pond on the Smiths' and the Williamses' properties. However, this "solution" increased the flow of water onto the Frolings' property. The additional amount of water flowing into the pond forced the pond to overflow with greater frequency. The water coming out of the pond would flow through a drainage ditch that the city had created on the north side of Rathmor Road and then through the culvert in the road onto the lower lying property on the south side of Rathmor Road.

In June 1997, the Frolings' property was flooded again, causing a substantial amount of property damage. After that flood, William Froling wrote to the city commissioners, requesting that they consider construction of a storm water drainage system. In that letter, Froling stated that a neighbor had told him that Warner used a canoe to get off the property after a heavy rain. Froling claimed that the city erred in approving the Kiriluks' construction and that the city had "confiscated" his property for a retention pond.

The city again hired engineers to study the drainage problems. And in October 1997, the engineers reported their findings to the city's manager, stating that "the existing drainage system is not of a size large enough to adequately handle the upstream drainage during larger

storm events." The engineers drew up a proposed storm drainage system to "be constructed by the home owner." The engineers estimated that the cost of the project would be approximately $210,000. Residents of Rathmor Road then signed a petition, requesting that the city construct a storm sewer consistent with the engineers' plan and proposing that the construction be paid through general tax revenues. The city rejected the proposal.

In March 2000, the Frolings retained a realtor to market their home. However, the realtor advised them that the flooding problems had to be resolved before the home could be sold. The realtor also advised them that, absent a permanent correction of the flooding problems, the property was " 'not saleable' as is."

In September 2000, after more flooding, William Froling wrote a letter to the city mayor, explaining that during this most recent incident, water was pouring onto their land from every direction, from the east and the Kiriluks' lot, from the north through the culverts under Rathmor Road, and from the golf course to the south. Froling proposed the creation of a special assessment district to construct the storm water system that the city's engineers had proposed. The city responded that a special assessment would not be established without a petition signed by area residents.

In 2002, the Country Club added multiple pipes to its course for additional drainage. The pipes tied directly into the pipes that already extended to the Smith/Williams pond.

In May 2004, rain fell consistently over an 18-day period, and the Frolings' property was flooded again. The Frolings had to hire workers to pump the floodwater away from their house.

In September 2004, the city's engineers submitted another report to the city, suggesting alternative proposals to remedy the storm water drainage problems. The engineers estimated that the updated cost of construction was approximately $350,000. The engineers explained, however, that "these options are to take water away from Mr. Froling's property at property lines or corners," but they would "do nothing for the water that drains from his property toward the home which is at the lowest point of his 2.5 acre lot." According to the engineers, "To create positive drainage around his home, substantial[ly] more work on his property would need to be done."

### B. THE FROLING TRUST'S COMPLAINT

On November 8, 2004, the Froling Trust[1] filed the present suit, alleging that, among others,[2] the city and the neighbors had taken actions that increased the flow of the water entering the Frolings' property. More specifically, the Froling Trust asserted claims of nuisance and trespass against the neighbors. The Froling Trust also asserted a claim of intentional trespass against the Kiriluks. With respect to the city, the Froling Trust asserted claims of gross negligence and taking by inverse condemnation for not preventing the flooding.

### C. THE NEIGHBORS' OFFER TO STIPULATE

On January 7, 2005, the neighbors served on the Froling Trust an offer to stipulate the entry of a judgment, offering to resolve all the claims made against them for a

---

[1] In June 1988, the Frolings deeded their home to the Froling Trust, the named plaintiff in these consolidated appeals.

[2] These other parties are not part of these appeals.

total of $100. The offer stated that it was being made "to compromise and settle disputed claims and should not be construed as an admission of any allegation or liability on any claim" and that "no judgment entered pursuant to this offer shall operate as an adjudication of the merits of any allegation or claim." The Froling Trust did not respond.

### D. THE CITY'S MOTION FOR SUMMARY DISPOSITION

In August 2005, the city moved for summary disposition under MCR 2.116(C)(7), (8), and (10), arguing that the governmental immunity doctrine barred the Froling Trust's claims. The city further argued that it was entitled to summary disposition of the Froling Trust's inverse condemnation claim because there was no evidence that the city had taken any direct action against the Frolings' property. In support of its motion, the city presented an affidavit from its engineer, attesting that "[a]ny alleged drainage problems on the Froling property is [sic] not the result of any City sewer or water drainage system."

After hearing oral arguments on the motion, the trial court granted the city's motion for summary disposition. The trial court ruled that the doctrine of governmental immunity barred the Froling Trust's claims against the city. The trial court also agreed with the city that the Froling Trust's inverse condemnation claim failed because the complaint did not allege any direct action that the city took against the Frolings' property. Accordingly, the trial court dismissed the city from the action with prejudice.

### E. THE NEIGHBORS' MOTIONS FOR SUMMARY DISPOSITION

In March 2006, the neighbors moved for summary disposition under MCR 2.116(C)(7), (8), and (10), argu-

ing that the three-year period of limitations, which began to run at the time that the Frolings first noted flooding on their property in 1989, barred the Froling Trust's trespass and nuisance claims. In connection with this argument, citing *Garg v Macomb Co Community Mental Health Services*,[3] they further contended that the "continuing wrongs" doctrine has been abrogated in Michigan.

After hearing oral arguments on the motion, the trial court first found that a claim for flooding, like the Froling Trust alleged, accrues at the time the land was first visibly damaged. The trial court explained that damages that accrue at a later date do not renew the limitations period or give rise to a new cause of action. Quoting this Court in *Horvath v Delida*,[4] the trial court stated that " 'a continuing wrong is established by continual tortious *acts*, not by continual harmful effects from an original, completed act.' " The trial court then concluded that the evidence established that the Frolings knew that the land was first visibly damaged in 1989; thus, the court stated that it needed to address the evidence that supported a continuing act separately with regard to each defendant. The trial court ruled that the Froling Trust had failed to produce evidence that the Kiriluks and the Williamses made any recent changes to the land in the three years preceding the complaint that could give rise to a finding of a new tortious act. With respect to the Smiths, however, the trial court concluded that a genuine issue of material fact remained regarding whether the Smiths' installation of a new outlet pipe on their property had contrib-

---

[3] *Garg v Macomb Co Community Mental Health Services*, 472 Mich 263; 696 NW2d 646 (2005), amended 473 Mich 1205 (2005).

[4] *Horvath v Delida*, 213 Mich App 620, 627; 540 NW2d 760 (1995) (emphasis in *Horvath*).

uted to flooding on the Frolings' property. Accordingly, the trial court granted summary disposition to the Kiriluks and the Williamses, but denied summary disposition with regard to the Smiths.

The Smiths later renewed their motion for summary disposition under MCR 2.116(C)(7) and (10), again arguing that the statute of limitations barred the Froling Trust's claims. Following a hearing on the motion, the trial court granted the Smiths' motion because further evidentiary discovery supported a conclusion that there was no genuine issue of material fact that the Smiths took no action on their property within the applicable three-year period.

### F. THE NEIGHBORS' MOTIONS FOR COSTS AND ATTORNEY FEES

The Kiriluks moved for partial costs and attorney fees in the amount of $35,861.27 with regard to their representation by Potter, DeAgostino, Campbell & O'Dea (the Potter firm), the second of two law firms that represented the Kiriluks. The Kiriluks argued that the Froling Trust's claims were frivolous and that the Kiriluks were entitled to fees and costs under the offer of judgment rule.[5] The Kiriluks also moved for costs in the amount of $146,793.44 with regard to their representation by Honigman Miller Schwartz and Cohn LLP (Honigman Miller), the law firm that initially represented the Kiriluks and also jointly represented the Williamses and the Smiths. The Kiriluks again asserted the offer of judgment rule in support of their motion. Also citing the offer of judgment rule, the Williamses moved for costs in the amount of $89,953.28 with regard to their representation by Honigman Miller.

---

[5] MCR 2.405.

The trial court held that the Kiriluks and the Williamses were entitled to an award of attorney fees and costs, but the trial court reserved its ruling on the amount of the award pending an evidentiary hearing. After holding an evidentiary hearing on the motion for attorney fees and costs, the trial court awarded the Kiriluks attorney fees and costs in the amount of $35,861.27 related to the Potter firm's representation. The trial court also awarded attorney fees and costs in the amount of $91,076.99 for the Kiriluks and $79,702.66 for the Williamses related to Honigman Miller's representation.

The Smiths, citing the offer of judgment rule, also moved for costs in the amount of $158,630.94 with regard to their representation by Honigman Miller. The trial court held that the Smiths were entitled to an award of attorney fees and costs, and after holding an evidentiary hearing, the trial court awarded $140,181.32 to the Smiths for Honigman Miller's representation.

### G. THE PRESENT APPEALS

In January 2007, the Froling Trust appealed the trial court's orders granting the city and the neighbors summary disposition and the trial court's orders ruling that the neighbors were entitled to attorney fees and costs under MCR 2.405. In May 2007, the Froling Trust appealed as of right the trial court's order awarding the Kiriluks attorney fees and costs related to the Potter firm's representation. And in May 2007, the Froling Trust appealed as of right the trial court's order awarding the neighbors attorney fees and costs related to Honigman Miller's representation, and the neighbors cross-appealed.

II. MOTIONS FOR SUMMARY DISPOSITION

A. STANDARD OF REVIEW

Under MCR 2.116(C)(7), a party may move for summary disposition on the ground that a statute of limitations bars the claim. MCR 2.116(C)(7) also provides that a party may move for summary disposition on the ground that governmental immunity bars the claim. Under MCR 2.116(C)(8), a party may move for summary disposition on the ground that the opposing party has failed to state a claim on which relief can be granted. And under MCR 2.116(C)(10), a party may move for summary disposition on the ground that there is no genuine issue with respect to any material fact and the moving party is entitled to judgment as a matter of law.

Although review under MCR 2.116(C)(8) allows only consideration of the pleadings, our review under MCR 2.116(C)(7) and (10) also must include consideration of all documentary evidence submitted by the parties.[6] More specifically, under MCR 2.116(C)(7), the plaintiff's well-pleaded factual allegations, affidavits, or other admissible documentary evidence must be accepted as true and construed in the plaintiff's favor, unless the movant contradicts such evidence with documentation.[7] Under MCR 2.116(C)(10), the moving party must specifically identify the undisputed factual issues and support its position with documentary evidence.[8] The trial court must consider all the documentary evidence in the light most favorable to the nonmoving party.[9]

---

[6] MCR 2.116(G)(5); *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999); *Johnson v Detroit*, 457 Mich 695, 701; 579 NW2d 895 (1998).

[7] MCR 2.116(G)(5); *Maiden, supra* at 119; *Smith v Kowalski*, 223 Mich App 610, 616; 567 NW2d 463 (1997); *Gortney v Norfolk & W R Co*, 216 Mich App 535, 538-539; 549 NW2d 612 (1996).

[8] MCR 2.116(G)(3)(b); *Maiden, supra* at 120.

[9] MCR 2.116(G)(4); *Maiden, supra* at 120.

We review de novo a trial court's rulings on a motion for summary disposition,[10] whether a cause of action is barred by a statute of limitations,[11] and the applicability of governmental immunity.[12]

### B. THE NEIGHBORS' MOTIONS FOR SUMMARY DISPOSITION

#### 1. STATUTE OF LIMITATIONS AND THE CONTINUING WRONGS DOCTRINE

Claims of property damage are subject to a three-year period of limitations. Specifically, MCL 600.5805 states:

> (1) A person shall not bring or maintain an action to recover damages for injuries to persons or property unless, after the claim first accrued to the plaintiff or to someone through whom the plaintiff claims, the action is commenced within the periods of time prescribed by this section.
>
> * * *
>
> (10) The period of limitations is 3 years after the time of the death or injury for all other actions to recover damages for the death of a person, or for injury to a person or property.

And, according the accrual statute, the period of limitations begins to run from the time the claim accrues, which is "the time the wrong upon which the claim is based was done regardless of the time when damage results."[13]

---

[10] *Tillman v Great Lakes Truck Ctr, Inc*, 277 Mich App 47, 48; 742 NW2d 622 (2007).

[11] *Colbert v Conybeare Law Office*, 239 Mich App 608, 613-614; 609 NW2d 208 (2000).

[12] *Baker v Waste Mgt of Michigan, Inc*, 208 Mich App 602, 605; 528 NW2d 835 (1995).

[13] MCL 600.5827.

The Michigan Supreme Court, however, has long recognized an exception to the application of a statutory period of limitations "[w]here there are continuing wrongful acts . . . ."[14] Under the doctrine, sometimes referred to as the "continuing wrongs doctrine," when the nuisance is of a continuing nature, the period of limitations does not begin to run on the occurrence of the first wrongful act; rather, the period of limitations will not begin to run until the continuing wrong is abated.[15] This Court later confirmed that the doctrine applied in nuisance and trespass cases.[16]

In light of this doctrine, the Froling Trust contends that when it filed this case in November 2004, it presumed that the continuing wrongs doctrine barred the application of the pertinent statute of limitations. The Froling Trust goes on to concede, however, that in May 2005, the Michigan Supreme Court issued its opinion in *Garg v Macomb Co Community Mental Health Services*.[17]

In *Garg*,[18] the Michigan Supreme Court overruled *Sumner v Goodyear Tire & Rubber Co*[19] with respect to its application of the "continuing violations" doctrine. In *Sumner*, the Court followed federal precedent and applied a "continuing violations" doctrine to a civil rights employment discrimination action.[20] But, in

---

[14] *Defnet v Detroit*, 327 Mich 254, 258; 41 NW2d 539 (1950).

[15] *Horvath, supra* at 626; *Hodgeson v Genesee Co Drain Comm'r*, 52 Mich App 411, 413; 217 NW2d 395 (1974).

[16] *Moore v City of Pontiac*, 143 Mich App 610, 614; 372 NW2d 627 (1985); *Heisler v Rogers*, 113 Mich App 630, 636; 318 NW2d 503 (1982).

[17] *Garg, supra.*

[18] *Id.* at 266, 284.

[19] *Sumner v Goodyear Tire & Rubber Co*, 427 Mich 505; 398 NW2d 368 (1986).

[20] *Id.* at 536.

*Garg*, the Court held that the doctrine was contrary to the statute of limitations in MCL 600.5805(10).[21] According to the Court, the Legislature expressly chose to limit commencement of claims for adverse employment actions to within three years of each action by a defendant:

> Section 5805 does not say that a claim outside this three-year period can be revived if it is somehow "sufficiently related" to injuries occurring within the limitations period. Rather, the statute simply states that a plaintiff "shall not" bring a claim for injuries outside the limitations period. Nothing in these provisions permits a plaintiff to recover for injuries outside the limitations period when they are susceptible to being characterized as "continuing violations." To allow recovery for such claims is simply to extend the limitations period beyond that which was expressly established by the Legislature.[22]

The neighbors argue that the holding in *Garg* completely abrogated the use of the continuing wrongs doctrine in Michigan. However, as the Froling Trust points out, *Garg* and *Sumner* dealt with employment discrimination claims. And, the Froling Trust notes, in *Attorney General ex rel Dep't of Environmental Quality v Bulk Petroleum Corp*,[23] this Court appeared to suggest in a footnote that *Garg*'s abrogation of the "continuing wrongs" doctrine was limited to the civil rights context. In *Bulk Petroleum Corp*, after stating that the continuing wrongs doctrine has only been applied in the limited context of nuisance, trespass, and civil rights cases, the Court then noted in a footnote that *Garg* abrogated the use of the doctrine in "claims filed under the Civil Rights Act, MCL 37.2101 *et seq.*, and the Persons With

---

[21] *Garg, supra* at 282, 284-285, 290.

[22] *Id.* at 282.

[23] *Attorney General ex rel Dep't of Environmental Quality v Bulk Petroleum Corp*, 276 Mich App 654, 667 n 3; 741 NW2d 857 (2007).

Disabilities Civil Rights Act, MCL 37.1101 *et seq.*"[24]
Therefore, the Froling Trust argues, *Garg* was a limited
decision and does not apply to bar this present cause of
action for nuisance and trespass.

The law relating to the current viability of the
continuing wrongs doctrine in the context of nuisance
and trespass claims is hopelessly confused.[25] Notably,
this confusion might be due to the fact that several
different terms have been used to refer to the same
doctrine, including, for example, "continuing wrongs doc-
trine," "continuing violations doctrine," "continuing-
wrongful-acts doctrine," and "continuing tort doctrine."

Since the issuance of *Garg*, numerous panels of this
Court have had the opportunity to consider continu-
ing wrongs arguments. However, most of these deci-
sions have been unpublished,[26] and unpublished deci-

---

[24] *Bulk Petroleum Corp, supra* at 667 n 3.

[25] See *Sumner, supra* at 524.

[26] *Edwards v 17th Dist Court*, unpublished opinion per curiam of the
Court of Appeals, issued July 31, 2007 (Docket Nos. 269664 and 269873);
*Dedivanaj v DaimlerChrysler Corp*, unpublished opinion per curiam of
the Court of Appeals, issued June 21, 2007 (Docket No. 266769); *Nelski
v Ameritech*, unpublished opinion per curiam of the Court of Appeals,
issued May 10, 2007 (Docket No. 273728); *Romeo Investment Ltd v
Michigan Consolidated Gas Co*, unpublished opinion per curiam of the
Court of Appeals, issued May 1, 2007 (Docket No. 260320); *Schultz v
Dep't of Environmental Quality*, unpublished opinion per curiam of the
Court of Appeals, issued February 20, 2007 (Docket No. 271285); *Pueblo
v Crystal Lake Improvement Ass'n*, unpublished opinion per curiam of the
Court of Appeals, issued February 13, 2007 (Docket No. 263231); *Ra-
manathan v Wayne State Univ Bd of Governors*, unpublished opinion per
curiam of the Court of Appeals, issued January 4, 2007 (Docket No.
266238); *Hill v PBG Michigan, LLC*, unpublished opinion per curiam of
the Court of Appeals, issued October 10, 2006 (Docket No. 268692); *Hicks
Family Ltd Partnership v 1st Nat'l Bank of Howell*, unpublished opinion
per curiam of the Court of Appeals, issued October 3, 2006 (Docket No.
268400); *Ferguson v Hamburg Twp*, unpublished opinion per curiam of
the Court of Appeals, issued August 8, 2006 (Docket No. 267597); *Wilkerson
v Univ of Michigan*, unpublished opinion per curiam of the Court of

sions have no precedential value.[27] Besides the *Bulk Petroleum Corp* panel, only three other panels of this Court have issued published opinions addressing the doctrine.

Six months before this Court released *Bulk Petroleum Corp* in September 2007, a panel of this Court decided and issued an unpublished decision in *Schaendorf v Consumers Energy Co* in March 2007. *Schaendorf* was approved for publication in May 2007.[28] In that case, this Court cited *Garg* and concluded that "the continuing-wrongful-acts doctrine is no longer viable with respect to claims arising beyond the period of limitations."[29] Accordingly, the panel held that the trial court erred by not dismissing the plaintiffs' nuisance claim.[30]

Appeals, issued July 25, 2006 (Docket No. 265220); *Somers v Cowell*, unpublished opinion per curiam of the Court of Appeals, issued June 27, 2006 (Docket No. 259598); *Allen v Estate of Dr Paul Jerome Treusch*, unpublished opinion per curiam of the Court of Appeals, issued April 20, 2006 (Docket No. 259737); *Hughes v Gen Motors Corp*, unpublished opinion per curiam of the Court of Appeals, issued March 7, 2006 (Docket No. 263688); *Detroit Edison Co v Augustin*, unpublished opinion per curiam of the Court of Appeals, issued February 2, 2006 (Docket No. 256728); *Spink v Macsteel Michigan*, unpublished opinion per curiam of the Court of Appeals, issued December 22, 2005 (Docket No. 263140); *Commercial Coin Laundry Sys v McGraw*, unpublished opinion per curiam of the Court of Appeals, issued December 20, 2005 (Docket No. 256026); *Mitchell v Policherla*, unpublished opinion per curiam of the Court of Appeals, issued November 15, 2005 (Docket No. 255476); *Greenshields v Plymouth Charter Twp*, unpublished opinion per curiam of the Court of Appeals, issued August 4, 2005 (Docket No. 261544); *Shepherd v Gen Motors Corp*, unpublished opinion per curiam of the Court of Appeals, issued July 26, 2005 (Docket No. 260171); *Beauchamp v Ford Motor Co*, unpublished opinion per curiam of the Court of Appeals, issued May 24, 2005 (Docket No. 256175).

[27] See MCR 7.215(C)(1).

[28] *Schaendorf v Consumers Energy Co*, 275 Mich App 507; 739 NW2d 402 (2007).

[29] *Id.* at 517.

[30] *Id.*

On April 15, 2008, a panel of this Court decided and issued an unpublished opinion in *Dep't of Environmental Quality v Waterous Co. Waterous Co* was approved for publication on June 24, 2008.[31] In that case, the panel concluded that the continuing wrongs doctrine applied to an action alleging a recurrent nuisance.[32]

Meanwhile, on April 22, 2008, another panel of this Court issued a published opinion in *Terlecki v Stewart*.[33] In *Terlecki*, this Court addressed the plaintiffs' claims for nuisance and trespass as a result of flooding on their property.[34] The defendants argued that the plaintiffs' claims were time-barred because the conduct that allegedly caused the flooding occurred more than three years before the plaintiffs filed their lawsuit in October 2005.[35] The plaintiffs countered that the continuing wrongs doctrine saved their claims.[36] The defendants responded, arguing first that *Horvath* made clear that the doctrine did not apply when the alleged wrongful acts are finite and only continuing harmful effects remained.[37] The defendants then argued alternatively that, in light of *Garg*, the continuing wrongs doctrine no longer existed in Michigan.[38]

In considering the parties' arguments, the *Terlecki* panel examined *Garg* and concluded that *Garg* was not

[31] *Dep't of Environmental Quality v Waterous Co*, 279 Mich App 346; 760 NW2d 856 (2008).

[32] *Id.* at 383-386.

[33] *Terlecki v Stewart*, 278 Mich App 644; 754 NW2d 899 (2008).

[34] *Id.* at 646-647.

[35] *Id.* at 646.

[36] *Id.* at 650.

[37] *Id.* at 651, citing and quoting *Horvath, supra* at 627 (" '[A] continuing wrong is established by continual tortious *acts*, not by continual harmful effects from an original, completed act.' ") (emphasis in *Horvath*).

[38] *Terlecki, supra* at 651-652.

limited to discrimination cases because in that case the Court was looking at the plain text of the limitations and accrual statutes when it held that the " 'the doctrine has no continued place in the jurisprudence of this state.' "[39] Therefore, applying *Garg*, the *Terlecki* panel concluded that the continuing wrongs doctrine did not apply and that the timeliness of the plaintiffs' claims needed to be determined under the plain text of MCL 600.5805(10) alone.[40] The Court additionally concluded that, even applying the continuing wrongs doctrine, the defendants had correctly argued that, under *Horvath*, the plaintiffs' claim was barred when the last cognizable tortious act occurred more than three years before the plaintiffs filed their lawsuit, regardless of any subsequent harmful effects.[41]

As can been seen from the line of recent published cases addressing the continuing wrongs doctrine, there is a clear conflict regarding its continued viability in cases alleging nuisance and trespass. Despite this conflict, we follow the holding and rationale of *Schaendorf* and *Terlecki* to the extent that they adopt *Garg* as applying beyond the context of civil rights claims to completely abrogate the continuing wrongs doctrine in trespass and nuisance actions as well. Under the "first out" rule of MCR 7.215(J)(1), we must follow the rule of law established by a prior published opinion of this Court issued on or after November 1, 1990. Therefore, the *Bulk Petroleum Corp* and *Waterous Co* panels should have followed *Schaendorf* or declared a conflict under MCR 7.215(J)(2). Because neither *Bulk Petroleum Corp* nor *Waterous Co* declared such a conflict, *Schaendorf* is the controlling precedent, and we are

---

[39] *Id.* at 654, quoting *Garg, supra* at 290.

[40] *Terlecki, supra* at 657-658.

[41] *Id.* at 656-657.

obligated to reject *Bulk Petroleum Corp* and *Waterous Co* to the extent that they conflict with the complete abrogation of the continuing wrongs doctrine in the jurisprudence of this state.

The Froling Trust also argues that *Garg* and its progeny should not apply because they were not issued until after the Froling Trust filed this cause of action. The neighbors point out that decisions are retroactive unless " 'exigent circumstances' justify the 'extreme measure' of prospective-only application."[42] The Froling Trust nevertheless counters that MCL 600.5869 precludes us from following *Garg*. MCL 600.5869 states that "[a]ll actions and rights shall be governed and determined according to the law under which the right accrued, in respect to the limitations of such actions or right of entry." According to the Froling Trust, "the law under which the right accrued" in this case was the continuing wrongs doctrine.

However, the Michigan Supreme Court recently abolished another common-law modification of the Legislature's statutory scheme of periods of limitations and, in so doing, gave its decision retroactive application despite the language of MCL 600.5869. In *Trentadue v Buckler Automatic Lawn Sprinkler Co*,[43] the Court considered whether the common-law discovery rule (which allowed tolling of the statutory period of limitations when a plaintiff could not have reasonably discovered the elements of a cause of action within the limitations period), could toll the period of limitations under MCL 600.5805(10), or whether MCL 600.5827, the accrual statute, alone governed the time of accrual. The Court ultimately concluded that MCL 600.5827

---

[42] *Trentadue v Buckler Automatic Lawn Sprinkler Co*, 479 Mich 378, 400; 738 NW2d 664 (2007) (citation omitted).

[43] *Id*. at 382.

alone controlled "because the statutory scheme is exclusive and thus precludes this common-law practice of tolling accrual based on discovery in cases where none of the statutory tolling provisions apply."[44] In so holding, the Court specifically rejected the application of MCL 600.5869 to allow lower courts to continue using the discovery rule.[45] The Court explained that MCL 600.5869 "does not *require* use of the rule . . . . Rather, the rule is judge-made law that has been applied on a case-by-case basis."[46] Moreover, allowing lower courts to continue using the discovery rule "would render [the Court's] opinion paradoxically meaningless because [its] holding would not apply to events occurring any time before the day [it] decided this case; although a claim that accrues tomorrow will be subject to the relevant statutory period and exceptions, a claim that accrued in 1986 may be brought at any time in the future, indefinitely."[47] After noting the general rule of retroactive application, the Court then explained:

> Even when a decision meets the threshold criterion for prospective application because it clearly establishes a new principle of law, we must consider: "(1) the purpose to be served by the new rule, (2) the extent of reliance on the old rule, and (3) the effect of retroactivity on the administration of justice." Here, prospective-only application is inappropriate. First, the very purpose of our holding is to respect limits the Legislature has placed on plaintiffs' abilities to revive suits relying on events occurring in the distant past; prospective application is therefore directly opposed to our resolve to honor the Legislature's policy choice. Moreover, as we already explained, the very nature of the discovery rule defies any reliance on its operation.

[44] *Id.* at 389.

[45] *Id.* at 399.

[46] *Id.* at 400 (emphasis in original).

[47] *Id.*

Finally, the administration of justice is not significantly affected because the rights and interests of plaintiffs and defendants are opposed in these matters; although plaintiffs may be denied relief for stale claims, defendants and the judiciary are relieved from having to defend and decide cases based on deteriorated evidence.[48]

The same rationale applies with regard to the continuing wrongs doctrine. The purpose of the holdings in *Garg* and its progeny was to respect the limits the Legislature has placed on a plaintiff's ability to revive a suit by relying on events occurring in the distant past for which only the damaging effects remain. Further, the nature of the continuing wrongs doctrine, in direct conflict with the statute of limitations and the accrual statute, defies any reliance on its operation. Finally, just as with the discovery rule, the administration of justice is not significantly affected because the rights and interests of plaintiffs and defendants are opposed in these matters. Although plaintiffs may be denied relief for stale claims, defendants and the judiciary are relieved from having to defend and decide cases based on deteriorated evidence.

Accordingly, we conclude that *Garg* and its progeny completely and retroactively abrogated the common-law continuing wrongs doctrine in the jurisprudence of this state, including in nuisance and trespass cases. Therefore, the Froling Trust's arguments fail to the extent that it relies on that doctrine to save its claims.

### 2. APPLYING THE PLAIN LANGUAGE OF MCL 600.5805(10)

The Froling Trust nevertheless argues that, even in the event that we interpret *Garg* as requiring the application of the plain language of MCL 600.5805(10),

---

[48] *Id.* at 400-401 (citation omitted).

the trial court erred by dismissing its claims because, under subsection 10, a plaintiff may file a claim anytime within three years following the "time of the . . . injury . . . ." And the Froling Trust claims that the flooding in May 2004, the time of the Froling Trust's last alleged "injury," would be the proper point at which to begin the running of the period of limitations. According to the Froling Trust, caselaw interpreting the accrual statute confirms that the period of limitations begins to run when damage is done, rather than when the conduct transpired.

As stated, MCL 600.5805 provides:

> (1) A person shall not bring or maintain an action to recover damages for injuries to persons or property unless, *after the claim first accrued* to the plaintiff or to someone through whom the plaintiff claims, the action is commenced within the periods of time prescribed by this section.

> \* \* \*

> (10) The period of limitations is 3 years *after the time of the* death or *injury* for all other actions to recover damages for the death of a person, or for injury to a person or property. [Emphasis added.]

And, according to the accrual statute, a period of limitations begins to run from the time the claim accrues, which is "the time the wrong upon which the claim is based was done regardless of the time when damage results."[49]

In *Trentadue*, the Court explained that because under MCL 600.5827 " '[t]he wrong is done when the plaintiff is harmed rather than when the defendant acted,' " the statute was "perfectly consistent" with

---

[49] MCL 600.5827.

MCL 600.5805(10).[50] This statement stems from the Court's decision in *Stephens v Dixon*,[51] in which it stated: "We have held that the term 'wrong,' as used in the accrual provision, refers to the date on which the plaintiff was harmed by the defendant's negligent act, not the date on which the defendant acted negligently." In other words,

[o]nce all of the elements of an action for . . . injury, including the element of damage, are present, the claim accrues and the statute of limitations begins to run. Later damages may result, but they give rise to no new cause of action, nor does the statute of limitations begin to run anew as each item of damage is incurred.[52]

The operation of these principles can be seen in a case with similar factual circumstances. In *Terlecki*, the defendants' last negligent conduct was in 2001 when they capped a pipe running through a culvert near the plaintiffs' property.[53] That same year, the plaintiffs began experiencing flooding and tree damage on their property.[54] Applying the plain language of MCL 600.5805(10) and MCL 600.5827 to the plaintiffs' cause of action for nuisance and trespass, this Court concluded that, despite the fact that the plaintiffs continued to suffer flooding and tree damage after 2001, the last possible date that the plaintiffs' claim could have accrued was in 2001, when both the last conduct and first, subsequent corresponding injury occurred.[55] Ac-

---

[50] *Trentadue, supra* at 387 n 8, quoting *Boyle v Gen Motors Corp*, 468 Mich 226, 231 n 5; 661 NW2d 557 (2003), citing *Stephens v Dixon*, 449 Mich 531, 534-535; 536 NW2d 755 (1995).

[51] *Stephens, supra* at 534-535, citing *Connelly v Paul Ruddy's Equip Repair & Service Co*, 388 Mich 146; 200 NW2d 70 (1972).

[52] *Connelly, supra* at 151.

[53] *Terlecki, supra* at 647.

[54] *Id.*

[55] *Id.* at 657-658.

cordingly, contrary to the Froling Trust's interpretation of the statutes, its claims are still time-barred.

Here, William Froling's testimony revealed that the Kiriluks' last action with regard to drainage of water on their lot was in November 1998. (Throughout their brief the Kiriluks claim that the last act was done in 1997; however, William Froling testified that, to his knowledge, the Kiriluks had not "done anything else with regard to [their] property . . . since November 18th of 1998.") The Smiths' last allegedly wrongful conduct occurred in 1995 or 1996, and the Williamses' last allegedly wrongful conduct occurred in 1997. Therefore, William Froling's testimony established that the last act of any of the three neighboring defendants at issue occurred in 1998. And the Froling Trust alleged that the Frolings next experienced flooding in June 2001. Therefore, it was during this June 2001 flooding that the Froling Trust suffered its first harm from the neighbors' last negligent act. In other words, after the last of the neighbors allegedly acted negligently in 1998, the harm first occurred, or accrued,[56] in June 2001. Accordingly, the subsequent flooding in May 2004 could only have been the continued result of the neighbors' completed conduct. Subsequent claims of additional harm caused by one act do not restart the claim previously accrued. For the purposes of accrual, there need only be one wrong and one injury to begin the running of the period of limitations. In sum, the accrual of the claim occurs when both the act and the injury first occur, that is when the "wrong is done."

Here, the Froling Trust's last claim first accrued with the flooding in June 2001. Thus, to be timely, the Froling Trust needed to file its claim by June 2004. But

---

[56] See MCL 600.5805(1) (specifically referring to the when "the claim *first* accrued") (emphasis added).

because it did not file its claim until November 2004, the Froling Trust's claims were time-barred. Accordingly, we conclude that, applying the plain language of MCL 600.5805(10), the trial court properly granted the neighbors summary disposition on the ground that the Froling Trust's claim was untimely.

### 3. DISCOVERY NOT YET COMPLETE

The Froling Trust argues that the trial court erred by dismissing the Froling Trust's claims against the Smiths and the Williamses because it was not given the opportunity to depose them regarding whether they approved the Country Club's actions in 2001 and 2002 of tying its drainage pipes to the pipes that flowed into the Smith/Williams pond.

Generally, summary disposition under MCR 2.116(C)(10) is premature if it is granted before discovery on a disputed issue is complete.[57] However, the mere fact that the discovery period remains open does not automatically mean that the trial court's decision to grant summary disposition was untimely or otherwise inappropriate. The question is whether further discovery stands a fair chance of uncovering factual support for the opposing party's position.[58] In addition, a party opposing summary disposition cannot simply state that summary disposition is premature without identifying a disputed issue and supporting that issue with independent evidence.[59] The party opposing summary disposi-

---

[57] *Village of Dimondale v Grable*, 240 Mich App 553, 566; 618 NW2d 23 (2000).

[58] *Id.*

[59] *Bellows v Delaware McDonald's Corp*, 206 Mich App 555, 561; 522 NW2d 707 (1994); see also MCR 2.116(H)(1) ("A party may show by affidavit that the facts necessary to support the party's position cannot be presented because the facts are known only to persons whose affidavits the party cannot procure.").

tion must offer the required MCR 2.116(H) affidavits, with the probable testimony to support its contentions.[60]

Here, the Froling Trust argues that it should have been allowed to conduct further discovery so that it could determine whether the Smiths and the Williamses had any involvement in the Country Club's 2001 and 2002 conduct of tying in pipes to flow into the Smith/Williams pond. However, the Froling Trust has not shown that there was a fair chance that further discovery would have revealed any evidence of the Smiths' or the Williamses' involvement with the Country Club and its conduct. Significantly, the Froling Trust fails to offer an affidavit that supports the contention that any such evidence even exists. Indeed, to the contrary, the Smiths and the Williamses have provided affidavits in which they attest that they had no knowledge of the Country Club's conduct.

Accordingly, we conclude that the trial court did not err by granting the Smiths and the Williamses summary disposition because there is no merit to the Froling Trust's argument that summary disposition was premature.

### C. THE CITY'S MOTION FOR SUMMARY DISPOSITION

#### 1. GOVERNMENTAL IMMUNITY

The Froling Trust argues that the trial court erred by dismissing the Froling Trust's claims against the city

---

[60] *Coblentz v City of Novi*, 475 Mich 558, 570-571; 719 NW2d 73 (2006) (concluding that the plaintiffs could not complain that summary disposition was premature because they did not offer the required MCR 2.116[H] affidavits indicating the probable testimony of witnesses whose affidavits in support of the plaintiffs' contentions could not be procured).

on the basis of governmental immunity[61] because the trial court failed to consider the "sewage disposal system event" exception to governmental immunity.[62] However, as the city argues, and as counsel for the Froling Trust conceded at oral argument, the Froling Trust waived this argument regarding the sewage disposal system event exception by not properly preserving it in the lower court proceedings. Accordingly, we conclude that there is no merit to the Froling Trust's argument that the trial court erred by granting the city summary disposition on the ground of governmental immunity.

### 2. INVERSE CONDEMNATION

The Froling Trust argues that the trial court erred by dismissing the Froling Trust's inverse condemnation claim against the city because it erred by determining that the Froling Trust failed to allege any affirmative action by the city directed at the Frolings' property.

A taking for purposes of inverse condemnation means that governmental action has permanently deprived the property owner of any possession or use of the property.[63] When such a taking occurs, the Michigan Constitution entitles the property owner to compensa-

---

[61] MCL 691.1401; MCL 691.1407; *Jackson Co Drain Comm'r v Village of Stockbridge*, 270 Mich App 273, 284; 717 NW2d 391 (2006); *Warda v Flushing City Council*, 472 Mich 326, 331-332; 696 NW2d 671 (2005); *Maskery v Univ of Michigan Bd of Regents*, 468 Mich 609, 613-614; 664 NW2d 165 (2003); *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567, 595; 363 NW2d 641 (1984).

[62] MCL 691.1416; MCL 691.1417; *Wesche v Mecosta Co Rd Comm*, 480 Mich 75, 84 n 10; 746 NW2d 847 (2008); *Linton v Arenac Co Rd Comm*, 273 Mich App 107; 729 NW2d 883 (2006).

[63] *Charles Murphy, MD, PC v Detroit*, 201 Mich App 54, 56; 506 NW2d 5 (1993).

tion for the value of the property taken.[64] A plaintiff alleging inverse condemnation must prove a causal connection between the government's action and the alleged damages.[65] For a taking to occur, "there must be some action by the government specifically directed toward the plaintiff's property that has the effect of limiting the use of property."[66] In other words, the plaintiff must prove that the government's actions were a substantial cause of the decline of the value of the plaintiff's property and must establish that the government abused its legitimate powers in affirmative actions directly aimed at the plaintiff's property.[67] In determining whether a taking occurred, the form, intensity, and deliberateness of the governmental actions toward the injured party's property must be examined.[68]

For example, in *Attorney General v Ankersen,* this Court concluded that the state's licensing of a person or corporation to conduct a private business could not be regarded as a taking of private property for public use and that the state's alleged misfeasance in licensing and supervising the operation did not constitute affirmative actions directed at the property.[69] Likewise, in *Hinojosa v Dep't of Natural Resources,*[70] this Court concluded that the state's failure to compensate neighboring property owners for damage caused by fire that spread from

---

[64] *Jack Loeks Theatres, Inc v Kentwood,* 189 Mich App 603, 608; 474 NW2d 140 (1991), vacated in part on other grounds 439 Mich 968 (1992).

[65] *Heinrich v Detroit,* 90 Mich App 692, 698; 282 NW2d 448 (1979).

[66] *Charles Murphy, supra* at 56.

[67] *Heinrich, supra* at 700.

[68] *Id.* at 698.

[69] *Attorney General v Ankersen,* 148 Mich App 524, 561-562; 385 NW2d 658 (1986).

[70] *Hinojosa v Dep't of Natural Resources,* 263 Mich App 537, 548-550; 688 NW2d 550 (2004).

a state-owned abandoned house was not an unconstitutional taking because the state took no direct action toward the plaintiffs' properties.

Here, the Froling Trust argues that the city has taken the Frolings' property for public use because the city has refused to construct a drainage system to cure their private water problems and because the city approved the Kiriluks' construction plans. However, the Froling Trust's claim must fail because it has not alleged any affirmative action by the city directly aimed at the Frolings' property. Further, because the Froling Trust's claim is without merit, the trial court did not err by not giving the Froling Trust another opportunity to amend its complaint.[71]

Accordingly, we conclude that the trial court did not err by dismissing the Froling Trust's inverse condemnation claim because there is no merit to its claim since it failed to allege any affirmative action by the city directed at the Frolings' property.

### III. ATTORNEY FEES AND COSTS

#### A. STANDARD OF REVIEW

We review for clear error the findings of fact underlying an award of attorney fees.[72] "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire record is left with a definite and firm conviction that a mistake was made."[73] We review de novo underlying questions of

---

[71] *Ben P Fyke & Sons v Gunter Co*, 390 Mich 649, 660; 213 NW2d 134 (1973) (stating that a court need not entertain a futile amendment).

[72] *Taylor v Currie*, 277 Mich App 85, 99; 743 NW2d 571 (2007).

[73] *Solution Source, Inc v LPR Assoc Ltd Partnership*, 252 Mich App 368, 381-382; 652 NW2d 474 (2002).

law,[74] and we also review de novo the interpretation and application of the offer of judgment rule.[75]

### B. THE NEIGHBORS' ENTITLEMENT TO ATTORNEY FEES AND COSTS UNDER MCR 2.405

Generally, attorney fees are not recoverable as an element of costs or damages unless expressly allowed by statute, court rule, common-law exception, or contract.[76] Under MCR 2.405, the offer of judgment rule, a party may serve on his or her opponent a written offer to stipulate the entry of a judgment.[77] The purpose of the offer of judgment rule is to avoid protracted litigation and encourage settlement.[78] If the offeree rejects the offer and the adjusted verdict is more favorable to the offeror than the average offer, the offeror may recover actual costs from the offeree.[79] An offer is rejected if not accepted as required by the court rule, including the failure to respond.[80] A judgment resulting from a grant of summary disposition is a verdict for purposes of imposing sanctions pursuant to MCR 2.405.[81]

---

[74] *Hines v Volkswagen of America, Inc*, 265 Mich App 432, 438; 695 NW2d 84 (2005).

[75] *Castillo v Exclusive Builders, Inc*, 273 Mich App 489, 492; 733 NW2d 62 (2007).

[76] *Haliw v Sterling Hts*, 471 Mich 700, 707; 691 NW2d 753 (2005); *Dessart v Burak*, 470 Mich 37, 42; 678 NW2d 615 (2004); *Fleet Business Credit, LLC v Krapohl Ford Lincoln Mercury Co*, 274 Mich App 584, 589; 735 NW2d 644 (2007).

[77] MCR 2.405(B).

[78] *Hanley v Mazda Motor Corp*, 239 Mich App 596, 603; 609 NW2d 203 (2000).

[79] MCR 2.405(D); *Freeman v Consumers Power Co*, 437 Mich 514, 516; 473 NW2d 63 (1991).

[80] MCR 2.405(C)(2); *Best Financial Corp v Lake States Ins Co*, 245 Mich App 383, 388; 628 NW2d 76 (2001).

[81] MCR 2.405(A)(4)(c); *Freeman, supra* at 518.

The Froling Trust argues, in pertinent part, that MCR 2.405(A)(1) was not properly applied in this case because the neighbors' offer was not an offer of *judgment* as the court rule defines, but rather an offer of *settlement*. The neighbors' offer stated:

> Pursuant to MCR 2.405, Defendants Alan Kiriluk and Marilynne Kiriluk, Roger B. Smith and Barbara Smith, and Gregg Williams and Cindi Williams offer to resolve all of the claims brought in Plaintiff's Complaint by entry of a judgment in the amount of $100.00 against Defendants Alan Kiriluk and Marilynne Kiriluk, Roger B. Smith and Barbara Smith, and Gregg Williams and Cindi Williams and in favor of Plaintiff. This offer is made to compromise and settle disputed claims and shall not be construed as an admission of any allegation or liability on any claim. Further, no judgment entered pursuant to this offer shall operate as an adjudication of the merits of any allegation or claim.

This Court has explained that an offer of settlement is not the same as an offer of judgment.[82]

> An agreement to settle does not necessarily result in a judgment. Although it usually results in a stipulated order of dismissal with prejudice, such an order does not constitute an adjudication on the merits. It merely "signifies the final ending of a suit, not a final judgment on the controversy, but an end of that proceeding." The plain language of MCR 2.405(A)(1) clearly requires an offer of judgment, not just an offer to settle.[83]

"Unlike the traditional settlement process that involves negotiations between the parties as well as compromise, an offer of judgment is a unilateral attempt to conclude a lawsuit without necessarily exercising arms length negotiations."[84]

---

[82] *Haberkorn v Chrysler Corp*, 210 Mich App 354, 378; 533 NW2d 373 (1995).

[83] *Id.* at 378 (citation omitted).

[84] *Hanley, supra* at 604.

> [An] MCR 2.405 offer of judgment is more akin to adjudication and entry of judgment based on the merits.

> [A]n offer of judgment more nearly emulates a judgment after a trial rather than a form of settlement. . . . [T]he key defining point is that private party settlement or mediation involve collective consideration of the facts favoring each party, discussion of the issues, arms-length negotiation and compromise, and contemplation of both entry of judgment and dismissal of the action, whereas an offer of judgment is a unilateral act seeking final resolution of a controversy with sanction of a court by entry of an enforceable judgment. This unilateral act results from a party's independent evaluation of the merits of the case with an eye toward complete resolution of the matter.[85]

"[A] judgment entered pursuant to the acceptance of an offer of judgment under MCR 2.405 functions as a full and final adjudication on the merits . . . ."[86] Further, "[r]es judicata applies to consent judgments."[87]

Here, the record demonstrates that the neighbors' offer was a unilateral attempt, based on their independent evaluation of the merits of the case, to conclude the lawsuit without the need for engaging in arms-length negotiation and compromise. And the neighbors clearly offered to resolve the pending claims for a sum certain "by entry of a judgment in the amount of $100.00 against" them.[88] However, this was not the complete offer. Rather, the following conditions were attached: "This offer is made to compromise and settle disputed claims and shall not be construed as an admis-

---

[85] *Id.* at 606.

[86] *Id.* at 606.

[87] *Ditmore v Michalik*, 244 Mich App 569, 576; 625 NW2d 462 (2001).

[88] See MCR 2.405(A)(1) (" 'Offer' means a written notification to an adverse party of the offeror's willingness to stipulate to the entry of a judgment in a *sum certain*, which is deemed to include all costs and interest then accrued.") (emphasis added).

sion of any allegation or liability on any claim. Further, no judgment entered pursuant to this offer shall operate as an adjudication of the merits of any allegation or claim."

The effect of these conditions leaves open the possibility of future lawsuits because the language effectively bars the application of res judicata in the future. What the neighbors were seeking was not truly entry of a "judgment" as contemplated by MCR 2.405(A)(1), which judgment has all the attributes of a judgment after full litigation, is considered a final adjudication on the merits, and implicates the doctrine of res judicata. The neighbors' offer was in actuality a disguised attempt simply to enter a stipulated order of dismissal. The offer did not reflect a willingness to stipulate the entry of a real judgment. Rather, the offer only reflected a willingness to pay the Froling Trust $100 without the strings or attributes of a true judgment being attached. We therefore conclude that the offer failed to meet the requirements of MCR 2.405(A)(1). It would undermine the function of MCR 2.405 to allow a defendant to offer an entry of a judgment but condition such offer on the judgment not having the effect of an ordinary judgment on the merits.

Accordingly, we conclude that the trial court erred by concluding that the neighbors were entitled to an award of attorney fees and costs under MCR 2.405.

### C. THE FROLING TRUST'S REMAINING ARGUMENTS

Given our conclusion on the Froling Trust's argument raised in Docket No. 275580, that the trial court erred by awarding attorney fees and costs to the neighbors under MCR 2.405, we conclude that the trial court similarly erred by awarding attorney fees and costs in Docket No. 277438. Therefore, we need not further

address the Froling Trust's arguments in Docket No.
277438 regarding the trial court's award of attorney
fees and costs, specifically with respect to the Kiriluks,
including the portion awarding more than $35,000 in
attorney fees to the Kiriluks for the Potter firm's
representation. Because we also conclude that the trial
court similarly erred by awarding attorney fees and
costs in Docket No. 278383, we need not further address
the Froling Trust's arguments in Docket No. 278383
regarding the trial court's award of attorney fees and
costs with respect to the neighbors, including the por-
tion awarding more than $310,000 in attorney fees to
Honigman Miller.

### D. THE NEIGHBORS' ARGUMENTS ON CROSS-APPEAL

Given our conclusion on the Froling Trust's argu-
ment raised in Docket No. 275580, that the trial court
erred by awarding attorney fees and costs to the neigh-
bors under MCR 2.405, we need not further address the
Smiths' and the Williamses' arguments on cross-appeal
in Docket No. 278383 regarding the trial court's award
of attorney fees and costs to them. Similarly, we need
not further address the Kiriluks' arguments on cross-
appeal in Docket No. 278383, regarding the trial court's
award of attorney fees and costs to them.

Affirmed in part and reversed in part. No taxable
costs pursuant to MCR 7.219, neither party having
prevailed in full.

MURPHY, P.J. (*concurring*). I concur in affirming in
part and reversing in part. Summary disposition in
favor of defendants was appropriate because the period
of limitations had expired, *Garg v Macomb Co Commu-
nity Mental Health Services*, 472 Mich 263; 696 NW2d
646 (2005), amended 473 Mich 1205 (2005); *Terlecki v*

*Stewart*, 278 Mich App 644; 754 NW2d 899 (2008), and the claim was untimely under MCL 600.5805(10). Further, I agree with the majority that summary disposition under the facts presented was not premature. I also agree with the majority's discussion regarding governmental immunity and inverse condemnation, as well as its analysis of the attorney fee and cost issues. I fail to see any point, however, in citing unpublished opinions in this appeal when published opinions with precedential value exist.