# STATE OF MICHIGAN

# COURT OF APPEALS

THOMAS WELGOSH and MARIE ANNE
WELGOSH,

        Plaintiffs-Appellants,

v

CITY OF NOVI, CHRIS WEBER, ISC-
INSPECTION SERVICES COMPANY, ISC
INSPECTION SERVICES COMPANY, and
MITCHELL KRUZEL,

        Defendants-Appellees,

and

CITY OF NOVI BUILDING INSPECTOR,

        Defendant.

UNPUBLISHED
March 19, 2015

No.  318516
Oakland Circuit Court
LC No.  2012-129420-CH

Before:  GLEICHER, P.J., and CAVANAGH and FORT HOOD, JJ.

PER CURIAM.

In 1998, plaintiffs commissioned the construction of a home in Novi.  Unbeknownst to them, their contractor failed to adequately gauge the groundwater level and continued construction without sufficient modification after discovering its error.  As a result, plaintiffs now live in a home that is prone to basement leaks and floods, is structurally unsound, and can only be sold at a loss.  Plaintiffs settled their claims against the contractor following arbitration in a prior suit.

After that action concluded, plaintiffs filed the current suit against the city of Novi, the city's building inspection department, and the individual inspector assigned to their home construction project, as well as the private engineering inspection firm hired by the contractor while attempting to remedy the water issues.  Plaintiffs accused these defendants of negligently failing to recognize and exacerbating the problem by recommending inappropriate repairs, and blindly approving or ignoring the contractor's poor workmanship.  The government actors' failure to conform to the standard of care resulted in the inverse condemnation of their property, plaintiffs further alleged.

-1-

The circuit court summarily dismissed all of plaintiff's claims. For the reasons detailed in this opinion, we affirm.

I. BACKGROUND

In 1998, plaintiffs retained Tri-Mount Custom Homes, Inc. to build an upscale residence in a Novi subdivision. During basement excavation, plaintiffs observed a stream of water running through the pit. Tri-Mount claimed that the water derived from an old farm drain tile, a common problem in the area and easily resolved. Tri-Mount's footing subcontractor advised city inspector Chris Weber that he saw water "bubbling" in one corner of the basement excavation. Tri-Mount repeated its assurance that the water came from a farm drain tile and reported that it had plugged the tile to solve the problem. Weber perceived no reason to doubt Tri-Mount and approved the footings.

In March 1999, plaintiffs notified Weber that they remained concerned about water in the basement excavation. Weber visited the construction site and observed water in the basement pit. He issued an oral "stop work" order and instructed Tri-Mount to address the problem. Tri-Mount retained S & V Construction Company to install an exterior "perimeter" or "edge" drain in April 1999. Tri-Mount contracted with ISC, an engineering firm, to "observe and report on" S & V's work. On April 14, 1999, Weber approved work on the basement after a visual inspection revealed no signs of water. Tri-Mount assured plaintiffs that there would not be a water problem in the basement once a sump pump was installed. Weber issued a certificate of occupancy on July 2, 1999. As part of the property sale closing, plaintiffs negotiated for Tri-Mount to extend the "written express warranty" by five years because they were concerned about the water problem.

According to plaintiffs, the water problem did not originate with farm drain tiles as expressed by Tri-Mount, but with groundwater. Plaintiffs allege that the basement was not properly elevated above the groundwater level. In 2001, the originally-installed and then replacement sump pumps failed because they were not designed to handle the quantities of groundwater affecting plaintiffs' property. Over the following three years, plaintiffs continued to experience problems. Tri-Mount even installed an industrial-strength sump pump system to no avail. Over time, groundwater under hydrostatic pressure just below the basement floor caused water to seep into floor joints. Plaintiffs experienced foundational and structural problems as a result. Throughout 2002, city officials attempted to work with Tri-Mount on plaintiffs' behalf to resolve the problem. Plaintiffs maintain that Tri-Mount and city officials erroneously attempted to address the problem as a "pump issue" or "plumbing fix," when the underlying problem was actually an "engineering issue" caused by inadequate elevation.

Plaintiffs filed a lawsuit against Tri-Mount in 2002, which was ultimately resolved through arbitration in 2011. In the instant action, plaintiffs assert claims of gross negligence against Weber, inverse condemnation against the city, and negligence and breach of contract against the ISC defendants.

## II. GROSS NEGLIGENCE CLAIM AGAINST WEBER

Plaintiffs alleged that building inspector Weber was grossly negligent in failing to investigate the real source of the water problem on plaintiffs' property, blindly accepting Tri-Mount's explanations and not requiring proper remediative measures before signing off on construction. Weber moved for summary disposition of plaintiffs' gross negligence claim under MCR 2.116(C)(7) and (8), arguing that he did not owe a legal duty of care to plaintiffs, that he was entitled to governmental immunity, and that his alleged negligence was not "the" proximate cause of plaintiffs' damages. Weber was entitled to governmental immunity because his actions were not the proximate cause of plaintiffs' injuries. Accordingly, the circuit court properly granted Weber's summary disposition motion.

We review de novo a circuit court's summary disposition ruling. *Roby v Mount Clemens*, 274 Mich App 26, 28; 731 NW2d 494 (2007). Summary disposition may be granted under MCR 2.116(C)(7) when a claim is barred by governmental immunity. In the face of such a motion, we must consider all affidavits, pleadings, and documentary evidence submitted by the parties, accepting uncontradicted statements as true and construing the documents in the nonmoving party's favor. *Id.* "If no facts are in dispute, or if reasonable minds could not differ regarding the legal effect of the facts, the question whether the claim is barred by governmental immunity is an issue of law." *Pierce v Lansing*, 265 Mich App 174, 177; 694 NW2d 65 (2005). Summary disposition may be granted under MCR 2.116(C)(8) when a party fails to state claim on which relief can be granted. Review of a motion under subrule (C)(8) is based on the pleadings alone, accepting as true all well-pleaded factual allegations. *Jenks v Brown*, 219 Mich App 415, 417; 557 NW2d 114 (1996). Summary disposition is appropriate under MCR 2.116(C)(8) "only when the claim is so clearly unenforceable as a matter of law that no factual development could possible justify a right of recovery." *Id.*

The governmental immunity statute, MCL 691.1407 provides, in pertinent part:

> (2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency . . . is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service . . . if all of the following are met:

> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.

> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.

> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

> * * *

> (7) As used in this section:

(a) "Gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

A "governmental function" is an activity expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law. MCL 691.1401(f); *Maskery v Univ of Mich Bd of Regents*, 468 Mich 609, 613-614; 664 NW2d 165 (2003).

To support a gross negligence claim in avoidance of governmental immunity, a plaintiff must establish four elements: "(1) duty, (2) breach, (3) causation, and (4) damages." *Hannay v Dep't of Transp*, ___ Mich ___; ___ NW2d ___ (Docket Nos. 146763 & 147335, decided December 19, 2014), slip op at 15 (citation omitted). In relation to causation, MCL 691.1407(2)(c) demands that the actor's conduct be "*the* proximate cause of the injury or damage." (Emphasis added.)

In *Robinson v Detroit*, 462 Mich 439, 462; 613 NW2d 307 (2000), our Supreme Court held that the Legislature's use of the definite article "the" in the phrase "the proximate cause" indicated that this statute "contemplates *one* cause." To avoid governmental immunity, the plaintiff must establish that "the employee's conduct amounts to gross negligence that is the one most immediate, efficient, and direct cause of the injury or damage, i.e., the proximate cause." *Id.*

Here, Tri-Mount's building code violations and inadequate remedial measures are the most immediate, efficient, and direct causes of the damage to plaintiffs' property. Even if Weber's negligence allowed Tri-Mount's poor workmanship to go uncorrected, Weber's conduct is not the one most immediate and direct cause of any damage. Accordingly, plaintiffs cannot establish liability in avoidance of governmental immunity.[1]

## III. INVERSE CONDEMNATION CLAIM AGAINST THE CITY

Plaintiffs further alleged the failure of the city and its agent to adequately recognize and force correction of the groundwater problem rendered their home virtually worthless, amounting to a taking by inverse condemnation. The circuit court summarily dismissed this claim pursuant to MCR 2.116(C)(10). In reviewing a (C)(10) motion, a court considers the "pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the non-moving party." *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008). "Summary disposition is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Id.*

---

[1] In their complaint, plaintiffs also accused Weber of "willful and wanton" misconduct. This appears to be an intentional tort claim. The governmental immunity standard for intentional torts differs from that of gross negligence. See *Odom v Wayne Co*, 482 Mich 459; 760 NW2d 217 (2008). Plaintiffs have waived any review of the dismissal of their intentional tort claim, however, by omitting the issue from their appellate brief.

"A de facto taking occurs when a governmental agency effectively takes private property without a formal condemnation proceeding." *Merkur Steel Supply, Inc v Detroit*, 261 Mich App 116, 125; 680 NW2d 485 (2004). "Inverse condemnation can occur without a physical taking of the property; a diminution in the value of the property or a partial destruction can constitute a 'taking.'" *Id.* In *Marilyn Froling Revocable Living Trust v Bloomfield Hills Country Club*, 283 Mich App 264, 294-295; 769 NW2d 234 (2009), this Court explained:

> A taking for purposes of inverse condemnation means that governmental action has permanently deprived the property owner of any possession or use of the property. When such a taking occurs, the Michigan Constitution entitles the property owner to compensation for the value of the property taken. A plaintiff alleging inverse condemnation must prove a causal connection between the government's action and the alleged damages. For a taking to occur, there must be some action by the government specifically directed toward the plaintiff's property that has the effect of limiting the use of property. In other words, the plaintiff must prove that the government's actions were a substantial cause of the decline of the value of the plaintiff's property and must establish that the government abused its legitimate powers in affirmative actions directly aimed at the plaintiff's property. In determining whether a taking occurred, the form, intensity, and deliberateness of the governmental actions toward the injured party's property must be examined. [Quotation marks and citations omitted.]

A de facto taking through inverse condemnation thereby requires proof of two elements: (1) "that the government's actions were a *substantial* cause of the decline" of its property value, and (2) that "the government abused its legitimate powers in affirmative actions directly aimed at the plaintiff's property." *Id.* at 295 (emphasis added). And there must be "a causal connection between the government's action and the alleged damages." *Id.*

In *Marilyn Froling Revocable Living Trust*, 283 Mich App 264, the plaintiff property owner brought an action against the city of Bloomfield Hills and neighboring property owners. The plaintiff's claims arose from an ongoing flooding problem caused by waters originating on the plaintiff's neighbors' properties and flowing onto the plaintiff's property. *Id.* at 268-273. The plaintiff asserted claims of gross negligence and taking by inverse condemnation against the city. *Id.* at 273. The plaintiff challenged the city's refusal to construct a drainage system that would resolve the water problem, and its approval of a neighbor's construction plan that allegedly contributed to the flooding. *Id.* at 296. The trial court determined that the plaintiff's inverse condemnation claim failed because its complaint "did not allege any direct action that the city took against the Frolings' property." *Id.* at 274. This Court affirmed because the plaintiff's complaint failed to "allege any affirmative action by the city directly aimed at the Frolings' property." *Id.* at 296.

In *Wiggins v City of Burton*, 291 Mich App 532; 805 NW2d 517 (2011), the plaintiff homeowners filed suit against their neighbors and the city of Burton in relation to a drainage problem in the subdivision. The plaintiffs' inverse condemnation claim against the defendant city alleged that a storm drain installed by the city to resolve an earlier flooding problem carried surface waters away from the defendant neighbors' parcels and into the plaintiffs' backyard. *Id.* at 537-538. The plaintiffs proved that the City committed an affirmative act specifically directed

at their property, which created a limitation of the plaintiffs' use of their property, this Court held. *Id.* at 572. This Court remanded to the trial court for further proceedings to determine whether the installation of the drain was a substantial cause of the decline of the plaintiffs' property value. *Id.* at 572.

In *Attorney General v Ankerson*, 148 Mich App 524; 385 NW2d 658 (1986), the attorney general and other state agents brought an action against the defendants for abatement of a nuisance and other claims related to improper hazardous waste storage. *Id.* at 531-532. State actors had previously granted industrial licenses to the defendant facility, which turned hazardous waste into electricity. *Id.* at 534. The defendants filed a countercomplaint alleging that the plaintiffs' actions "participated in the creation of a nuisance and that their actions amounted to an uncompensated taking." *Id.* at 532. The defendants "alleged that the granting of licenses and subsequent failures to supervise and regulate the disposal operations . . . caused a loss of use and value in the property and constituted a 'taking.'" *Id.* at 560-561. This Court held that the defendants' inverse condemnation claim "must fail as a matter of law for two reasons." *Id.* at 561.

> First, the granting of a license to a private citizen or a private corporation for the purpose of allowing that person or corporation to conduct a private business cannot be regarded as a taking of private property by the government for public use. Although licensing provides some assurances that a business will operate in accordance with lawful standards, and the public presumably derives a benefit therefrom, the issuance of a license does not in any way grant the public a right of use in the property. Similarly the alleged failure of the DNR to properly supervise and regulate the disposal operation cannot be regarded as a taking of private property by the government for public use.

> Secondly, the state's alleged misfeasance in licensing and supervising the operation does not constitute "affirmative actions directly aimed at the property". Thus, . . . the inaction and omissions by the state cannot be found to constitute a "taking". [*Id.* at 561-562.]

In *Miller Bros v Dep't of Natural Resources*, 203 Mich App 674, 678; 513 NW2d 217 (1994), the department director determined that any oil or gas development in the Nordhouse Dunes Area would violate state law. The plaintiffs, owners and lessors of oil and gas rights in the protected area, therefore brought an inverse condemnation action. *Id.* at 678-679. The trial court found that the director's decision amounted to a taking of the plaintiffs' property rights, and granted summary disposition for the plaintiffs. *Id.* at 679. This Court affirmed the trial court's decision, holding that the governmental action precluded the plaintiffs from obtaining permits for drilling in the protected area, the one and only economically viable use for the property interest. A taking occurred because the state "had so restricted the use of plaintiffs' property rights that plaintiffs had been deprived of all economically viable use." *Id.* at 679-680.

Here, plaintiffs failed to show that the City abused its legitimate powers in affirmative actions directly aimed at their property. There was no affirmative action by the city. Weber did not abuse his powers in approving the Tri-Mount-installed footings, or in rescinding the stop-work order, based on Tri-Mount's representation that it made appropriate remediation of the

water problem. Weber made a decision within the context of his duties as a building inspector. There was no affirmative act such as installing infrastructure that impacted plaintiffs' property, or issuance of a decision that deprived plaintiffs of the use of their property. The loss of value to plaintiffs' property was caused by Tri-Mount's negligent work, not the City's decisions.

Plaintiffs attempt to recast the City's failure to enforce the building code as an affirmative act of "maladministration." However, at its core, plaintiffs' claim is based on an omission, i.e., inadequate inspection. Plaintiffs fail to cite any caselaw or other authority supporting that a government's failure to enforce regulations or a building code might constitute an inverse taking. In the cases most similar to the instant case, this Court rejected the theory that a government's approval of private action that causes an adverse impact to the plaintiff's property could constitute an inverse condemnation. See *Marilyn Froling Revocable Living Trust*, 283 Mich App 296 (the plaintiff's claim was based in part on the defendant city's approval of a neighbor's construction plan), and *Ankerson*, 148 Mich App at 561-562 (the defendants attempted to base their inverse condemnation claim on the state's alleged misfeasance in licensing and supervising regulatory activities at the property). Clearly, this Court has rejected the theory that a municipality's approval of a private act constitutes inverse condemnation where the approval leads to an unintended adverse consequence to a plaintiff's property interest. Accordingly, we affirm the circuit court's dismissal of plaintiffs' inverse condemnation claim against the City.

## IV. CLAIMS AGAINST THE ISC DEFENDANTS

Plaintiffs accused the ISC defendants of negligence and of breaching the "third party beneficiary agreement" ISC had entered with Tri-Mount, both of which the circuit court dismissed. Plaintiffs challenge the circuit court's alleged failure to address whether they were third-party beneficiaries to the Tri-Mount-ISC contract before rendering its decision.

This case is governed by *Fultz v Union-Commerce Assoc*, 470 Mich 460; 683 NW2d 587 (2004). And this Court thoroughly analyzed the *Fultz* decision in *Boylan v Fifty Eight LLC*, 289 Mich App 709; 808 NW2d 277 (2010):

> The plaintiff in *Fultz* slipped and fell in an icy parking lot owned by Comm-Co Equities. 470 Mich at 461. Comm-Co had contracted with Creative Maintenance Limited (CML) for snow removal services. *Id.* at 462. The plaintiff sued both Comm-Co and CML, claiming that CML's negligent failure to plow or salt the parking lot had caused her fall. *Id.* The plaintiff theorized that CML owed her "a common-law duty . . . to exercise reasonable care in performing its contractual duties" and that CML breached this duty by failing to perform its contractual duty of plowing or salting the parking lot. *Id.* at 463-464. The Supreme Court observed that the plaintiff had "allege[d] no duty owed to her independent of the contract," but instead relied on "common-law tort principles expressed in Restatement Torts, 2d, § 324A . . . ." *Id.* at 464, 468.

> The Supreme Court held that as a matter of law, CML "owed no contractual or common law duty to plaintiff to plow or salt the parking lot." *Id.* at 463. In reaching this conclusion, the Supreme Court rejected that a common-law duty to the plaintiff arose solely from CML's breach of its contract with Comm-

Co. The Court instructed lower courts to instead analyze tort claims brought by third parties to a contract "by using a 'separate and distinct' mode of analysis. Specifically, the threshold question is whether the defendant owed a duty to the plaintiff that is separate and distinct from the defendant's contractual obligations. If no independent duty exists, no tort action based on a contract will lie." *Id.* at 467. [*Boylan*, 289 Mich App at 715-716.]

"*Fultz* specifically contemplated that despite the existence of a contract, under certain circumstances tort duties to third parties may lie," *Boylan*, 289 Mich App at 716, continued:

> If defendant negligently performs a contractual duty or breaches a duty arising by implication from the relation of the parties created by the contract, the action may be either in contract or in tort. In such cases, however, no tort liability arises for failing to fulfill a promise in the absence of a duty to act that is separate and distinct from the promise made. [*Fultz*, 470 Mich at 469-470.]

Stated differently, tort liability may attach in the presence of a duty that arises separately and distinctly from the contractual agreement.

> In *Fultz*, the Supreme Court posited that the creation of a "*new* hazard" may give rise to a breach of a duty separate and distinct from the contract. *Id.* at 469 (emphasis in original). *Fultz*'s "new hazard" reference derived from this Court's decision in *Osman v Summer Green Lawn Care, Inc*, 209 Mich App 703; 532 NW2d 186 (1995), overruled in part on other grounds by *Smith v Globe Life Ins Co*, 460 Mich 446; 597 NW2d 28 (1999). . . . The plaintiff in *Osman* also slipped and fell on an icy surface subject to a snow removal contract. *Osman*, 209 Mich App at 704. This Court summarized the plaintiff's allegations that the defendant

>> breached its duty by negligently, carelessly, and recklessly removing snow from the premises and placing it on a portion of the premises when it knew, or should have been known or anticipated, that the snow would melt and freeze into ice on the abutting sidewalk, steps, and walkway, thus posing a dangerous and hazardous condition to individuals who traverse those areas. Plaintiff alleged that defendant was negligent in failing to keep the premises and all common areas fit for their foreseeable uses and in failing to remove ice from areas after notice of the dangerous condition, in allowing ice to build up, in maintaining a hazardous condition when it could have been reasonably discovered, and in failing to remove a dangerous condition. [*Id.*]

> The defendant argued that its contract with the landowner "indicated that defendant assumed no duty or responsibilities of the premises owner," nor "any of the responsibility for damage or injury caused by slipping and falling on any pavement surface." *Id.* at 705.

This Court found that the contract at issue "allow[ed] only one interpretation," and specifically referred to the following contractual language: "'Nothing contained in this agreement shall relieve Provider from liability for its breach of this agreement or damages caused to person or property as a result of Provider's, its employees', its agents' or representatives' negligence.'" *Id.* at 706-707 (emphasis omitted). The Court in *Osman* explained that when "[r]ead as a whole," the contractual language obligated the defendant "to provide snow removal services in a reasonable manner, holding defendant liable for its negligent conduct in the snow removal process." *Id.* at 707. The Court elaborated that the defendant's tort duty to the plaintiff stemmed from two sources:

> Not only did the contract articulate that defendant would remain liable for its negligent conduct, but such duty also arose out of defendant's undertaking to perform the task of snow plowing. The duty allegedly owing is that which accompanies every contract, a common-law duty to perform with ordinary care the things agreed to be done. Those foreseeably injured by the negligent performance of a contractual undertaking are owed a duty of care. [*Id.* at 707-708 (citation omitted).]

The common-law duty of care existed "separate and apart from the contract itself" as part of "a general duty owed by defendant to the public of which plaintiff is a part." *Id.* at 710.

> In *Fultz*, the Supreme Court declined to overrule this portion of *Osman*. The Supreme Court reasoned that in *Osman*, the defendant had created a new hazard by placing snow near pedestrian walkways, in an area where melting and freezing snow foreseeably created a danger "'to individuals who traverse those areas.'" *Fultz*, 470 Mich at 469, quoting *Osman*, 209 Mich App at 704. The *Fultz* Court emphasized that unlike the defendant in *Osman*, "CML's failure to carry out its snow-removal duties owed to [Comm-Co] created no new hazard to plaintiff." *Fultz*, 470 Mich at 469. [*Boylan*, 289 Mich App at 716-718.]

In *Boylan*, the underlying contract between the township and nonparty Pamar revolved around the installation of a new water main. *Id.* at 719.

> By virtue of the contract, Pamar assumed a duty to construct the water main according to certain detailed specifications. Presumably, Pamar fulfilled its contractual obligations by successfully installing the water main. Notwithstanding that the new water main would potentially benefit neighboring property owners, *Fultz* teaches that no duty to perform the water-main contract existed with respect to Pamar and third parties. Alternatively phrased, Fifty Eight would have no cause of action had the flooding occurred simply because Pamar neglected to install the water main. However, separate and distinct from Pamar's contract to install a new water main for Lyon Township, Pamar bore a duty to exercise reasonable care when it entered onto and altered private property. Pamar's contract with Lyon Township for "[i]nstallation of approximately 6,600 linear feet of [16-inch] water

-9-

main along Ten Mile Road, intersecting Milford Road, in Lyon Township, Michigan," neither created this separate duty of care nor eliminated it. [*Id*.]

The tort claim in *Boylan* did not arise solely from Pamar's performance of its contract; Pamar also entered onto the plaintiff's property, "trigger[ing] several separate and distinct common-law duties to avoid permanently damaging the property. The common law indisputably recognizes a landowner's right to the full enjoyment of his or her land." *Id*. Pamar breached those duties through its actions on the plaintiff's property, rendering it liable in tort to the plaintiff despite its contract with the township. *Id*. at 721.

Here, plaintiffs could have no viable tort claim against the ISC defendants. The negligence alleged by plaintiffs is the very meat of the ISC-Tri-Mount contract: the duty to inspect the property and advise on the proper method to remedy the groundwater problem. The contract was to provide a service for plaintiffs' property and the performance quality of that contracted-for service is the point of contention.

And plaintiffs could raise no contract-based claim against the ISC defendants. As noted in *Boylan*, 289 Mich App at 728-730:

> In MCL 600.1405, the Legislature has defined, in relevant part as follows, who may claim third-party-beneficiary status with respect to an agreement entered into by other parties:
>
> > Any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.
> >
> > (1) A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise has undertaken to give or to do or refrain from doing something directly to or for said person.
>
> The Michigan Supreme Court has summarized that
>
> > the plain language of this statute reflects that not every person incidentally benefitted by a contractual promise has a right to sue for breach of that promise, but rather only if the promisor has "undertaken to give or to do or refrain from doing something directly to or for said person." [*Brunsell v City of Zeeland*, 467 Mich 293, 296; 651 NW2d 388 (2002).]
>
> "By using the modifier 'directly,' the Legislature intended 'to assure that contracting parties are clearly aware that the scope of their contractual undertakings encompasses a third party, directly referred to in the contract, before the third party is able to enforce the contract.'" *Schmalfeldt v North Pointe Ins Co*, 469 Mich 422, 428; 670 NW2d 651 (2003), quoting *Koenig v South Haven*, 460 Mich 667, 677; 597 NW2d 99 (1999). When determining whether MCL 600.1405 applies to a purported third-party beneficiary, "a court should look no further than

the form and meaning of the contract itself" and should view the contract objectively. *Schmalfeldt*, 469 Mich at 428 (quotation marks omitted).

In *Kisiel v Holz*, 272 Mich App 168; 725 NW2d 67 (2006), this Court considered facts somewhat analogous to those presented here. The plaintiff in *Kisiel* contracted with the Holz Building Company, Inc, for the construction of a home. *Id.* at 169. Holz's owner subcontracted with GFA Development, Inc., for excavation and concrete work. *Id.* When numerous cracks appeared in the basement walls and floor, the plaintiff sued Holz and several other defendants, contending that he was an intended third-party beneficiary under the agreement between Holz and GFA. *Id.* at 169-170. This Court rejected the argument that the plaintiff could maintain a contract action "merely because he or she would receive a benefit from its performance or would be injured by its breach." *Id.* at 170-171.

> In general, although work performed by a subcontractor on a given parcel of property ultimately benefits the property owner, the property owner is not an intended third-party beneficiary of the contract between the general contractor and the subcontractor. 9 Corbin, Contracts (interim ed), § 779D, p 41; see also 2 Restatement Contracts, 2d, § 302, comment e, illustration 19, p 444 (property owner is only an incidental beneficiary of construction subcontract between general contractor and subcontractor). Absent clear contractual language to the contrary, a property owner does not attain intended third-party-beneficiary status merely because the parties to the subcontract knew, or even intended, that the construction would ultimately benefit the property owner. [*Id.* at 171.]

After reviewing the language employed in the contract between Pamar and Lyon Township in light of these governing legal principles, we discern no support for Fifty Eight's contention that it qualifies as a third-party beneficiary of this agreement. The contract nowhere refers to Fifty Eight. At best, Fifty Eight qualifies as an incidental beneficiary of the portion of the contract requiring Pamar to "provide the necessary protection to prevent damage, injury or loss to . . . other property at the site . . . ."

Plaintiffs' argument focuses on the nature of the ISC defendants' work at the construction site, but they do not address the question of how their services were provided for plaintiffs' benefit when plaintiffs were not parties to the contract. That the work was conducted at a home being constructed for plaintiffs' purchase is not controlling as directed by *Kisiel*, 272 Mich App 169-171. Because there is no evidence that plaintiffs were intended beneficiaries of the contract

between the ISC defendants and Tri-Mount, the circuit court did not err in granting summary disposition in favor of the ISC defendants on plaintiffs' breach-of-contract claim as well.

We affirm.

/s/ Elizabeth L. Gleicher
/s/ Mark J. Cavanagh
/s/ Karen M. Fort Hood